COURTRIGHT v. THE CEDAR RAPIDS & MISSOURI RIVER R. R. Co. *et al.*

1. Railroad lands: CONSTRUCTION OF GRANTS. Under the act of congress of May 15, 1856, granting to the State of Iowa alternate sections of land for the purpose of aiding in the construction of certain railroads, the State was authorized to dispose of the first 120 sections before any portion of the road was built; and in that respect the Iowa Central Air Line R. R. Co., to and upon which the State, by the act of July 14, 1856, granted and conferred said lands under the restrictions and upon the conditions therein mentioned, possessed a like authority.

2. —— In making the selection of said 120 sections, the company was not confined to a specific locality, but left to its choice anywhere within a continuous twenty miles.

3. —— EFFECT OF GRANT AS A CONVEYANCE. The act of congress above mentioned conferring said lands upon the State, and the act of the State in conferring them on said railroad company, was as sufficient to vest the title in the company to lands properly selected, as a formal conveyance thereof.

*Appeal from Linn District Court.*

MONDAY, DECEMBER 11.

THIS is an action at law to recover certain lands in the counties of Woodbury and Manona. There was a trial to the court without a jury and a judgment for plaintiff. Defendants appeal. The facts of the case are fully set out in the opinion of the court.

*Isaac Cook* and *N. M. Hubbard* for the appellants.

*Platt Smith* and *A. Chapin* for the appellee.

BECK, Ch. J. — The title to the lands involved in this suit rests upon and involves construction of certain acts of congress and of the General Assembly of this State. The lands themselves are a part of the congressional grant to the State, of May 15, 1856, to aid in the construction of a railroad from Lyons north-easterly to the line of the Iowa Central Air Line Railroad and thence to the Missouri river. The plaintiff claims under the Iowa Central Air Line R. R. Co., an incorporation which, he alleges, succeeded to all the rights of the State to the lands in question under a legislative grant. The defendants claim the lands under a subsequent act of the General Assembly of the State repealing the act conferring the lands upon plaintiff's grantor, and bestowing them upon the Cedar Rapids & Missouri River R. R. Co., one of the defendants, in consideration of the construction of its railroad. A particular statement of the legislation, both State and national, in regard to these lands, as well as of the other facts of the case, is demanded.

I. By the act of May 15, 1856 (Chap. 28, Sess. 1, 34th Congress, 11 Statutes at Large, p. 9), congress granted to the State of Iowa, for the purpose of aiding in the construction of certain railroads therein named, " every alternate

Courtright v. The Cedar Rapids & Missouri River Railroad Co.

section of land, designated by odd numbers, for six sections in width on each side " of the respective roads.    The first section of the act, after making the grant of the lands by the description just quoted, and prescribing the manner of supplying deficiencies resulting from the sales of lands along the lines of the roads by the United States, etc., contains this provision : " That the lands hereby granted for and on account of said roads severally, shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatever."    The other parts of this statute necessary to be quoted are the following : " Section 3. *And be it further enacted*, That the said land hereby granted to the said State shall be subject to the disposal of the legislature thereof for the purpose aforesaid, and no other "   *   *   *.   " Section 4. *And be it further enacted*, That the lands hereby granted to said State shall be disposed of by said State only in manner following : that is to say, that a quantity of land not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each side of said roads may be sold, and when the governor of said State shall certify to the secretary of the interior that any twenty continuous miles of said road is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within the continuous length of twenty miles of each of said roads, may be sold ; and so from time to time until said roads are completed ; and if any of said roads are not completed within ten years no further sale shall be made, and the lands unsold shall revert to the United States."

By the act of the General Assembly, approved July 14, 1856 (Laws Extra Session 5th General Assembly, chap. 1),

Courtright v. The Cedar Rapids & Missouri River Railroad Co.

the grant made by congress to the State in the foregoing statute was accepted and provisions made to carry out the trust thereby conferred. The sections of this act which it is important to consider are in the following language:

"Section 1. *Be it enacted by the General Assembly of the State of Iowa*, That the lands, rights, powers and privileges granted to and conferred upon the State of Iowa by the act of congress entitled, etc. (the act above cited), be and the same are hereby accepted upon the terms, conditions and restrictions contained in said act of congress.

"Sec. 4. That so much of the lands, interests, rights, powers and privileges as are or may be granted and conferred in pursuance of the act of congress aforesaid to aid in the construction of the railroad from Lyons city northwesterly to a point of intersection with the main line of the Iowa Central Air Line Railroad near Maquoketa, thence on said main line, running as near as practicable to the forty-second parallel, across the said State to the Missouri river, are hereby disposed of, granted and conferred to and upon the Iowa Central Air Line R. R. Co., a body corporate, created and existing under the laws of the State of Iowa.

"Sec. 8. The grants aforesaid are made to each of said companies, respectively, upon the express condition that, in case either of said railroad companies shall fail to have completed and equipped seventy-five miles of its road within three years from the 1st day of December next, thirty miles in addition in each year thereafter, for five years, and the remainder of their whole line of road in one year thereafter, or on the 1st of December, A. D. 1865, then and in that case it shall be competent for the State of Iowa to resume all rights conferred by this act upon the company so failing, and to resume all rights to the lands hereby granted and remaining undisposed of by the company so failing to have its length of road completed in manner and time as aforesaid."

The Iowa Central Air Line R. R. Co. accepted the grant made by the foregoing act in accordance with its terms and conditions, and made a survey and location of its line of road. In the years 1857 and 1858 it did a large amount of grading upon its road between Lyons and Maquoketa. In 1858 the corporation issued certain deeds of trust to secure construction bonds, land scrip, etc. The plaintiff was one of the contractors who did the grading upon the road and received in payment therefor bonds and land scrip of the company which, under the terms of the deeds of trust, were surrendered, and the land in controversy was conveyed therefor by the company to plaintiff in November, 1859. It is not questioned that if the railroad corporation had the ability to convey a title to the lands it is vested in plaintiff under the deeds to him.

The Iowa Central Air Line R. R. Co. having failed to complete any part of its road, the General Assembly, by an act approved March 17, 1860 (Acts 8th General Assembly, chap. 25), declared "that all the rights to the lands, interests, rights, powers and privileges heretofore conferred or intended to be conferred upon the Iowa Central Air Line R. R. Co. by an act approved July 14, 1856, entitled, etc. * * * be and the same are hereby absolutely and entirely resumed by the State." "Section 2. The fourth section of said act approved July 14, 1856, and all other acts and parts of acts inconsistent with this act are hereby repealed."

By the act of March 26, 1860 (Acts 8th General Assembly, chap. 37), the lands, interests, rights, powers and privileges conferred by the act of July 14, 1856, were granted to the Cedar Rapids & Missouri River R. R. Co., the statute declaring that the right, title and interest in the lands held by the State, and nothing more, was transferred, and that "in no event shall said company have any claim or recourse against the State for any defect in the title or conveyance of said lands."

The lands conveyed to plaintiff by the Iowa Central Air Line R. R. Co., with other lands conveyed prior to February 16, 1860, amount to one hundred and twenty sections. They are all located in Woodbury and Manona counties, and in townships numbering from 83 to 87 north, ranges 42 and 43 west, and are west of parts of the grant from which the amount of lands could have been selected; one hundred and twenty sections or more of the original grant lie east of range 33.

The lands in controversy were duly selected under the provisions of the act of congress making the grant, and were certified to the State by the secretary of the interior December 27, 1858.

Congress, by act of June 2, 1864, recognized the grant made by the State to the Cedar Rapids & Missouri R. R. Co. The act is amendatory to the act making the original grant. But in section 4 it is expressly provided "that nothing in this act shall be construed to interfere with, or in any manner impair any rights acquired by any railroad company named in this act to which this is an amendment, or the rights of any corporation, person or persons, acquired through any such company, nor shall it be construed to impair any vested rights of property, but such rights are hereby reserved and confirmed.

II. We are required to determine, upon the statutes and facts above set out, whether plaintiff holds the title to the lands involved in the suit. The act of congress of the 15th of May, 1856, first demands consideration in prosecuting this inquiry.

This statute grants to the State certain lands to aid in the construction of railroads named therein. The object of the grant is explicitly stated to be the construction of those railroads, and, in order to effectuate such purpose, certain conditions restricting the sale of all the lands are prescribed. It is provided that a quantity of land not exceeding 120 sections, included within a continuous

length of twenty miles of the road, may be sold, and when twenty miles of the road are completed another like quantity may be sold, and so on till the road is completed. Now it will be observed that, in order to authorize the sale of the first 120 sections, no part of the road is required to be built and no restriction of any kind is placed upon the disposition of that quantity of the land. It is too plain to admit of question that the State was authorized to dispose of 120 sections of land before the road or any part of it was built. The language of the act will admit of no other construction.

Now while, as we have stated, the object of the grant was to aid in the construction of the railroad, the successful appropriation of the first 120 sections to that purpose, or the completion of any part of the road, is not made a condition to the grant of that quantity or a condition precedent to the exercise of the powers of sale thereof by the State. Congress relied upon the good faith of the State in order to secure the building of the first twenty miles of railroad, granting the power to sell the land as soon as the title vested in the State, for the purpose, it may be, of enabling the State to apply the proceeds at once to the work. But, whatever may have been the intention of congress, certain it is, the law imposes no restriction upon the sale of the first 120 sections. The condition applies to the lands remaining after that quantity has been sold. This is made very plain by the language of the last clause of section 4, which is to the effect that if the road is not completed in the year no further sale shall be made and the lands unsold shall revert to the United States. Now, this provision contemplates the disposition of the land as provided in the preceding part of the section, namely, that 120 sections may be sold, before any part of the road is completed or even commenced. The failure to complete any part of the road, it is expressly declared, shall only work a forfeiture of the land remaining unsold. It is plain that

the law contemplates the sale of a part of the land, the 120 sections, before the completion of any part of the road.

The act of the 5th General Assembly of July 14, 1856 (Laws of 1856, chap. 1), accepts the grant made by the act of congress of May 15, 1856, upon the terms, conditions and restrictions therein expressed. The lands in controversy, with the other lands of the grant set apart for that purpose, as well as all the interest, rights, powers and privileges granted and conferred by the act of congress upon the State, are disposed of, granted and conferred to and upon the Iowa Central Air Line R. R. Co. "Sec. 5. This grant is upon the condition that in case the railroad corporation shall fail to complete seventy-five miles of the road within three years and thirty miles each year for five years thereafter, and the remainder of the whole line in one year thereafter, or on the 1st of December, 1865, then the State may resume all right to the lands granted and remaining undisposed of by the company." It will be noticed that this act does not provide for the sale of the lands by the railroad company, or rather imposes no restriction or condition upon the sale. So far as the statute is concerned the grant to the company is absolute except as to the condition that if the road should not be completed as provided for, the State may resume the lands remaining unsold. There is to be found nothing in this act depriving the company of the right to sell the lands granted, if it be admitted that the act passed the title to the grantee therein, and upon that question we will have something to say hereafter. What restriction existed upon the right of the company to sell the land? None whatever, except those imposed by the act of congress making the grant. Though the grant of the State was absolute, reserving only the power to resume all rights to the lands remaining undisposed of upon the failure of the company to complete the road in the manner and time prescribed,

VOL. XXXV. — 50

yet the conditions and restrictions imposed by the act of congress upon the State rested upon the railroad company. It took just such a title as the State held, and received it burdened by the same conditions, and none other. As we have seen, under the act of congress the State had power to sell 120 sections of land without any restriction; the sale of the remainder only of the land was restricted. This right and this title the State confirmed and granted to the railroad company. It received an absolute title to the 120 sections and a right to convey the same without restriction; its title to the remainder of the land was conditional and its power to sell subject to the restriction above stated.

Certain sections of the act last cited make provisions to secure the rights of persons, who, at the time of the grant, held claims by actual occupation and improvements upon the lands granted by congress. It directs that such persons shall prove their claims before the judge of the county where the lands lie, and shall receive from such judge a certificate of the fact, which entitles the holder to purchase the land at $2.50 per acre. This certificate is required to be filed with the secretary of the railroad company, and, in the language of the statute, "shall entitle the holder or his assigns to the possession of said land until the title shall become vested in the company." Upon this language defendant's counsel base an argument in support of their position "that no title to the land was intended to be vested in the company by the act alone." The argument is, that as the statute declares the party in possession of the land shall hold it "until the title shall become vested in the company," this language is a direct declaration that the railroad company acquired no title by force of the act alone. The several provisions of the act must, if possible, be made to harmonize by construction. We have just seen that other provisions will bear no other interpretation than that the title and right to dispose of the first 120 sections were vested by the statute in the

company. The title and right of disposition to the remainder of the lands, we have seen, was conditional, depending upon the completion of certain parts of the road. By applying the language under consideration to these lands a subject is found upon which the provision may operate. Its force and effect is preserved and the other provisions of the statute are sustained. The whole statute, by this construction, is permitted to stand. We conclude that the language and provision under consideration are applicable alone to the lands remaining undisposed of after the sale of the first 120 sections of land.

In support of their position that the grant of the lands by the State to the railroad company rests upon conditions precedent, which must be performed before title vests, counsel cite *The State ex rel.* v. *Kirkwood,* 14 Iowa, 162. This was an action brought to compel the governor of the State by writ of mandamus to certify the completion of certain parts of the Cedar Rapids & Missouri R. R., as contemplated by section 4 of the act of congress of May 15, 1866, the statute granting lands to the State for railroad purposes. But it will be seen by reference to the section named that the certificate required had no relation to the one hundred and twenty sections of land, the sale of which first is provided for, but to the remainder of the grant. Neither did the case cited by counsel involve any part of these one hundred and twenty sections for this very reason. The question as to whether the title granted by the State for these one hundred and twenty sections rested upon a condition precedent to be performed by the railroad company was not raised nor determined.

III. As has already been stated the one hundred and twenty sections of land conveyed by the Iowa Central Air Line R. R. Co., of which the lands in controversy are a part, were selected west of range 33. A sufficient quantity of the lands of the grant was situated east of that range from which the selection could have been made.

Defendants rely upon this fact to defeat plaintiff's title. This position is based upon section 4 of the act of congress of July 15, 1856, above quoted, which provides that for the completion of twenty miles of the road one hundred and twenty sections of land included within *a continuous length of twenty miles* of such road may be sold. The language may be understood to limit the selection of the land along the line of the completed road; upon this point we express no opinion. But certain it is that this provision does not apply to the one hundred and twenty sections to be selected and sold before the road at any part is finished. The language applicable to such lands is found in the first part of the section and is as follows: "A quantity of land not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each of said roads may be sold." There is nothing in this language fixing the locality of the land selected further than it shall be within a continuous length of twenty miles of this road. It cannot mean that the selection shall be made along the road where completed, for as we have seen the lands were authorized to be sold before any part of the road was finished. Neither can it mean that the lands must lie along the east or west ends of the road, for the act itself recognizes the fact that sufficient government lands were not found upon the eastern extremity of the road to fill the grant. The defendants claim that the selection should have been made beginning with the most easterly vacant lands in the grant and going west twenty miles. We observe nothing in the words of the law authorizing this construction. There is no direction as to the selection, except that it be confined within the limits of twenty miles along the road. No word or phrase is used indicating an attempt to express the will of the legislature to the effect claimed by defendants. To us it clearly appears that the location of

the lands, within the twenty continuous miles around, was left to the choice of the railroad company.

The argument in support of the construction adopted by defendants most relied upon by them is based upon the object of congress in making the grant, namely, the building of a railroad through the public lands and thereby advancing the value of lands not appropriated and securing their speedy occupation by actual settlers. This road, it is insisted, was intended to be commenced at the Mississippi river, and constructed by several successive sections westward. Advantages are attempted to be pointed out to the government resulting from this manner of selection. We are unable to admit the force of the argument or to see clearly the advantages to the United States which would result from choice of the lands upon the eastern part of the grant. But conceding that such advantages are real, congress failing to secure them by express words, we certainly cannot interpolate such words by construction and thus create a reading for the statute which it does not in fact possess. We are of the opinion that benefits to result to the government from a particular construction must not determine the proper interpretation of the law. The government would doubtless be benefited by restrictions or limitations upon the grant which would operate to defeat it, but this fact should rather weigh against such a construction than in its support.

These views are not in conflict with the rule recognized in *The Dubuque & Pacific R. R. Co.* v. *Litchfield*, 23 How. 66, cited by defendants' counsel, to the effect that in construing a legislative grant, if the words *fairly* admit of different meanings, that one must be adopted which is most favorable to the interests of the public. In our judgment by no *fair* construction can conflicting meanings be put upon the law under consideration. The interpretation insisted upon by defendants' counsel is forced and unnatural, and can only be maintained by making the

language of the law give way to facts and circumstances entirely extraneous.

The learned counsel of defendants make a statement of facts in their brief which, in our opinion, overthrows their argument upon this point. They say that if the selection "had taken the most easterly vacant lands, one hundred and twenty sections could not have been found in any continuous twenty miles." The law requires the selection to be made within "twenty continuous miles" of the road; defendants say this twenty miles must begin at the east, and yet admit that in such "continuous twenty miles" one hundred and twenty sections of land could not have been found. Now, here is a state of facts under which it was absolutely impossible to carry out the statute as interpreted by counsel. If their interpretation be adopted it must be conceded that the one hundred and twenty sections could have been located along two or more divisions of the road of twenty continuous miles, a direct violation of the plain language of the law, or that the first one hundred and twenty sections of land could not have been located at all, which would directly defeat that provision of the statute.

The fact admitted by defendants' counsel, as above stated, undoubtedly was in the mind of the legislators when the statute was enacted, and accounts for the wording of the provision under consideration, whereby the location is not confined to the lands in the eastern part of the grant. Under the terms of the grant one hundred and twenty sections were appropriated to each twenty miles of road and no more, except where selections were made to supply deficiencies. Now, where the railroad company is limited to take one hundred and twenty sections in "twenty continuous miles," the statute was so drawn that the location could be made upon a line of twenty continuous miles which did contain one hundred and twenty sections. If, on account of entries of the pub-

lic lands upon eastern divisions of the road, one hundred and twenty sections could not be found in the distance specified, the law is so worded that the railroad company was permitted to make a selection elsewhere.

In reaching our conclusion herein, one member of the court, Mr. Justice COLE, gives much consideration and weight to the thought that the grant by congress was made to aid in the construction of the railroad between the two termini named; that the act does not expressly specify where it shall be begun nor in which direction constructed; that it distinctly provides for the sale of 120 sections in advance of the construction of any part of the railroad; hence, the first 120 sections may be taken or sold in a continuous twenty miles anywhere between the two termini, for it may not and need not by the terms of the act be known, when they are taken and sold, where the construction of the railroad will in fact begin. This thought is greatly strengthened by the special phraseology of the act which after providing for the sale of the first 120 sections of land, then further provides that "when the governor of said State shall certify to the secretary of the interior that *any* twenty continuous miles of said road is completed, then another quantity of land not to exceed 120 sections * * * may be sold."

IV. The act of congress granting the lands to the State and the State law conferring them upon the Iowa Central Air Line R. R. Co., was sufficient after selection provided for to pass the title and vest it in the railroad corporation without any further assurances. The legislative act of the sovereign power is just as effective for that purpose as could be any formal conveyance executed by its officers. And so it has been repeatedly held. Laws of congress and of the States, treaties, and grants by the proper authorities have been held sufficient evidence of titles without other assurances. *Lissum et al.* v. *Price*, 12 How. 59; *Rutherford* v. *Green's Heirs*, 2 Wheat. 196; *The United*

*States* v. *Perchman,* 7 Pet. 51; *Mitchell et al.* v. *The United States,* 9 id. 711; *Ladyae* v. *Roland et al.,* 2 How. 581; *United States* v. *Brooks et al.,* 10 id. 442.

V. The congressional and State laws having vested an absolute right and title to the lands in question in the Iowa Central Air Line R. R. Co., the act of July 14, 1856, whereby the State sought to resume the land, did not divest plaintiff's title acquired from the railroad company. The statutes granting the lands are in the nature of contracts, and the rights secured thereby cannot be impaired by subsequent legislation. This position is fully admitted by defendant's counsel.

It follows that plaintiff holds the legal title to the lands in controversy and that the decision of the district court must be sustained.

We do not find it necessary to follow the counsel of the respective parties in their arguments upon several branches of the case, and more than one point is made in their briefs which we do not pass upon, as the views above stated are decisive of the case.

Affirmed.

MILLER, J., dissenting. — I cannot concur in the construction put upon the act of congress of May 15, 1856, in the opinion of the majority, or with the conclusion reached. My views of the proper construction of that act are stated in the case of *The Cedar Rapids & Mo. R. R. Co. et al.* v. *Carroll County et al.,* announced at the present term, to which I refer, desiring to add nothing further.