[No. 3670.   Decided December 19, 1901.]

THE STATE OF WASHINGTON, *Respondent, v.* ANTON JO-
HANSON, *Appellant.*

SCHOOL LANDS — GRANT FROM UNITED STATES — ACTION BY STATE
    FOR POSSESSION.

Under the settled policy of our national government from
its inception in granting to the various states and territories
sections 16 and 36 of the public lands in each township for com-
mon school purposes, and indemnity lands in case such sections
had been settled upon prior to the survey by *bona fide* settlers,
the grant contained in § 10 of the act enabling the territory
of Washington to set up a state government must be construed as
including such indemnity lands as had been selected under prior
acts of congress, although specifically naming no other sections
than those numbered 16 and 36, but providing that "where such
sections, or any parts thereof, have been sold or otherwise dis-
posed of by or under the authority of any act of congress, other
lands equivalent thereto,· in legal subdivisions of not less than
one quarter section, and as contiguous as may be to the section
in lieu of which the same is taken, are hereby granted to said
state for the support of common schools;" and under such grant
the state is vested with an equitable title to such indemnity
lands selected by it as will warrant it in maintaining the statu-

tory action for possession under Bal. Code §§ 5500, 5508, against an intruder thereon.

Appeal from Superior Court, King County.—Hon. WILLIAM HICKMAN MOORE, Judge. Affirmed.

C. W. Corliss and John F. Main, for appellant.

Thomas M. Vance, Assistant Attorney General, for the State.

The opinion of the court was delivered by

FULLERTON, J.—This was an action brought by the state of Washington to recover from the appellant the possession of a certain tract of land lying in King county. In its complaint the state alleges, in substance, that it is seized in fee, entitled to the possession, and was on the 12th day of March, 1893, in possession, of the land in controversy, and that the appellant, on the date named, without right or title, entered into the possession of the land, ousted the state therefrom, and unlawfully retains possession thereof. The answer is a general denial. At the trial the facts were stipulated, and appear in the findings of fact made by the trial court. These findings are as follows:

"(1) That the north half of the southwest quarter and the northwest quarter of the southwest quarter of section 3, township 25 north, range 4 east, is of the value of twenty thousand dollars, and was selected by Philip H. Lewis, as agent for King county, Washington territory, by filing a list of this and other lands, designated as 'List No. 2 of indemnity school selection,' at the land office at Olympia, Washington territory, May 24, 1870, under an act of congress approved March 2, 1853, and an act of congress approved February 26, 1859, which said selection was approved by Secretary C. Delano January 27, 1872. (2) March 13, 1893, Anton Johanson made application to enter the land aforesaid under the homestead laws, and at that time made a settlement thereon. He has ever since

lived on said land.  His application was rejected by the local land office, and subsequently appealed to the commissioner of the general land office, and finally to the secretary of the interior, who, on December 18, 1895, decided adversely to Anton Johanson."

The sole question presented by the record therefore is, has the state such title to the lands in controversy as will enable it to recover possession from one who has entered into its possession without right?  And in considering this question it must be borne in mind that in this state it is not an essential prerequisite to the right of recovery in this form of action that the claimant show a legal title.  While the action is in form assimilated to the old action of ejectment, it is in its nature a statutory action, in which the rights of the respective claimants, both legal and equitable, are tried and determined, and the superior title, whether legal or equitable, is allowed to prevail.  Bal. Code, §§ 5500, 5508.  The state asserts title to the land under the several acts of congress reserving for its use and granting to it certain parts of the public domain for the support of its common schools.  The first of these is found in the act creating the territory of Washington.  Act Congress, March 2, 1853 (10 St. at Large, 172).  By § 20 of that act it is provided:

"That when the lands in said territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market or otherwise disposing thereof, sections numbered sixteen and thirty-six in each township in said territory shall be, and the same are hereby, reserved for the purpose of being applied to common schools in said territory.  And in all cases where said sections sixteen and thirty-six, or either or any of them, shall be occupied by actual settlers prior to survey thereof, the county commissioners of the counties in which said sections so occupied as aforesaid are situated, be, and they are hereby, authorized to locate other lands to an equal

amount in sections, or fractional sections, as the case may be, within their respective counties, in lieu of said sections so occupied as aforesaid."

The next is the act of February 26, 1859 (11 St. at Large, 385). That act was applicable to all of the territories. It enacted that where settlements were made with a view to pre-emption upon the public lands in advance of the surveys which should be found to have been made upon sections 16 or 36, such lands should be subject to the pre-emption claims of the settlers; and that other lands of like quality should be reserved for the use of the common schools, to be selected "in accordance with the principles of adjustment and the provisions of the act of congress of May 20, 1826." Lastly, by act of February 22, 1889 (25 St. at Large, 676), enabling the people of the territory of Washington to form a constitution and state government, "and to be admitted into the Union on an equal footing with the original states." By the tenth section of the latter act it is provided:

"That upon the admission of each of said states into the Union, sections numbered sixteen and thirty-six in every township of said proposed states, and where such sections, or any part thereof, have been sold or otherwise disposed of by or under the authority of any act of congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said states for the support of common schools, such indemnity lands to be selected within said states in such manner as the legislature may provide, with the approval of the secretary of the interior; provided, that the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the

grants or to the indemnity provisions of this act, until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain."

And by § 4 of the act it was provided that the convention elected to frame a constitution should provide by ordinance irrevocable without the consent of the United States and the people of the state, that provision be made for the establishment and maintenance of a system of public schools free from sectarian control, which should be open to all the children of the state. This requirement was complied with by making the provision a part of the fundamental law. Constitution, art. 26, subd. 4. The contention of the appellant is that the acts of March 2, 1853, and February 26, 1859, did no more than reserve from entry under the land laws of the United States the several tracts of lands therein described, and, as the tenth section of the enabling act, granting lands to the state for the use of its common schools, described only sections 16 and 36 thereof, it was not intended that lands theretofore selected and reserved in lieu of lands lost by reason of settlements made prior to the extension of the surveys, should pass to the state by virtue of the grant contained therein; and hence, whether these selected lieu lands are still reserved from entry by qualified settlers under the existing laws of the United States, or whether they are a part of public domain subject to such entry can make no difference in the result of this case, as the title thereto, and consequent right of control thereof, is still within the United States, and the state has no such title, either legal or equitable, as will enable it to maintain an action to recover possession.

Looking for a moment to the history of these reservations for and grants of the public domain by the general government for the use of the public schools, we find that the practice originated in the earliest times. It is said by the su-

preme court of the United States (*Cooper v. Roberts*, 18 How. 173), to be traceable to the ordinance of 1785, which is the first enactment for the disposal by sale of the public lands in the western territory. In that case the court, after noticing the ordinance cited, said:

"The appropriation of public lands for that object became a fundamental principle, by the ordinance of 1787, which settled terms of compact between the people and states of the Northwestern Territory and the original states, unalterable except by consent. . . . This principle was extended, first, by congressional enactment (1 Stats. at Large, 550, § 6), and afterwards, in 1802, by compact between the United States and Georgia to the Southwestern Territory. The earliest development of this article, in practical legislation, is to be found in the organization of the state of Ohio, and the adjustment of its civil policy, according to the ordinance, preparatory to its admission to the Union. Proposals were made to the inhabitants of the incipient state to become a sovereign community, and to accept certain articles as the conditions of union, which, being accepted, were to become obligatory upon the United States. The first of these articles is 'that the section No. 16 in every township, and where such section has been sold, granted, or disposed of, other lands equivalent thereto and most contiguous to the same, shall be granted to the inhabitants of such township, for the use of schools.' "

That the government has steadily adhered to this policy, an examination of the several acts admitting states into the Union will show. But whether there can be found in the several acts of congress above cited, relating to the territory and state of Washington, a compact between the United States and the state "unalterable except by consent," by which the state is entitled to a grant of the lands in controversy from the United States, if such grant was not made by the enabling act, may be doubted; yet it cannot be doubted that the purpose of such reservations was that

the state might have, upon its admission into the Union, sections 16 and 36 of every township within the boundaries of the state, or an equal quantity and quality of land in lieu thereof should it be found that the government could not, for any reason, grant these particular sections to the state when the state should be so admitted. That it would not be able to grant these particular sections in their entirety without doing an injustice to certain persons whom it invited and encouraged to move into the territory and settle upon the public lands therein, was known to congress when it passed the act creating the territory. It was known that such settlers would occupy these lands in advance of the surveys. The injustice of denying to a *bona fide* settler the right to acquire title to land he should so occupy and improve in ignorance of its true location was so manifest that legislation was necessary for his protection. The purpose of these acts was thus twofold: It was to protect actual *bona fide* settlers in their settlements, and to preserve to the states a fixed proportion of the public domain for the support of schools and means of education, which the founders of the government had said "shall forever be encouraged." The conditions anticipated by congress actually happened. Settlements were made upon the public domain within the territory prior to the extension of the public surveys over it. Certain of these settlements were found to fall within sections 16 and 36, and the government, recognizing the settler's prior rights, patented the land to the settler. In lieu of certain lands occupied and lost to the use of the common schools in this way, the board of county commissioners, pursuant to authority expressly granted them by congress, selected the lands in controversy. This selection was, pursuant to the same authority, approved by the secretary of the interior. The lands so selected stood from that time until the passage of the enabling act with-

drawn from settlement in the place and stead of lands which by that act would, without any question, have passed to the state under the descriptive terms used in § 10 thereof had they not "been sold or otherwise disposed of." Why, then should it be held not to pass under the descriptive terms used in that section? There can be but one reason, namely, the one suggested by the appellant,—they are not expressly mentioned. But this is not necessarily conclusive. These acts are public statutes, and are to be construed as such, and not as private grants. It is not the rule that acts making grants of the public domain are always to be construed strictly against the grantee. As was said by Mr. Justice FIELD in *Winona, etc., R. R. Co. v. Barney,* 113 U. S. 618, 625 (5 Sup. Ct. 606, 609), the acts making grants "are to receive such a construction as will carry out the intent of congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent, we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." And especially is this true where the grant is made in pursuance of a fixed and settled policy of the government, originated at its foundation, and believed then, and at all times since, to be a policy necessary to the perpetuation of the government's very existence. Reading all of these acts together, there can be no mistake as to the intent of congress. It intended these lands for the use of the common schools of the state, and intended to grant them to the state for that purpose when it passed the enabling act. Had it been otherwise, it would not, in the first instance, have provided for their selection and reservation; nor would it, when it passed the enabling act, have failed to make provision for their disposition, knowing as it must

have known, of their reservation, and the purposes for which they were reserved. To contend otherwise is to contend that congress did not intend to admit the state of Washington into the Union "on an equal footing with the original states." It is also to convict congress of being ignorant of the history and conditions of the subject-matter over which it was legislating. A reference to the title of the enabling act will show that the first is contrary to the purpose of congress, and the second is contrary to the rule that ignorance of the status of the subject-matter over which it has legislated can never be imputed to a legislative body. True, these lands have never been patented to the state by the general government, but such patent is unnecessary to pass the title. If the lands were included in the grant, the equitable title, at least, with the right of possession, passed by the grant to the state, which is title sufficient, as we have shown, to enable the state to maintain an action to recover possession from any one intruding thereon.

We conclude, therefore, that the lands in controversy passed to the state by virtue of the grant contained in the enabling act, and that the judgment appealed from must stand affirmed. It is so ordered.

Reavis, C. J., and Dunbar, Anders and White, JJ., concur.