[No. 9503.   Department Two.   January 4, 1912.]

THE STATE OF WASHINGTON, *Appellant*, v. EDWARD R. WHITNEY *et al.*, *Respondents.*[1]

PUBLIC LANDS—SCHOOL LANDS—FEDERAL GRANT—CONSTRUCTION— GRANT IN PRAESENTI OR FUTURO. The Federal grant to the state of school sections 16 and 36, by 25 Stat. at L. 676, §§ 10 and 11, whereby the land was "hereby granted" to the state, was a grant *in praesenti*, vesting title in the state, although the land was unsurveyed, in view of the provision of § 11 that such land shall not be subject to preemption, homestead, or any other entry, whether surveyed or unsurveyed, but shall be reserved for school purposes only.

SAME—SCHOOL LANDS—GRANTS—WITHDRAWAL FROM ENTRY—STATUTES—IMPLIED REPEAL—GENERAL ACT REPEALED BY SPECIAL ACT. The amendment of the general act of 1859, 11 Stat. at L. 385, which provided that school sections 16 and 36 shall be subject to the homestead or preemption claims of settlers where settlements have been or shall hereafter be made before survey of the lands in the field, by the act of 1891, 26 Stat. at L. 796, which added the provision for lieu sections by the states or territories, of other lands of equal acreage when such settlements have been or shall hereafter be made before the survey in the field, did not have the effect of impliedly repealing the special act of 1889, 25 Stat. at L. 676, granting *in praesenti* to the states of North and South Dakota, Montana, and Washington, school sections 16 and 36, and providing that the same shall not be subject to any entry whether surveyed or unsurveyed; as repeals by implication are not favored, and a special act will not be held to be impliedly repealed by a general law on the same subject, unless the intent to repeal is clearly manifest.

PUBLIC LANDS—SCHOOL LANDS—GRANT TO STATE—COMPACT WITH STATES—EFFECT OF SUBSEQUENT ACT. The grant to the states of

[1]Reported in 120 Pac. 116.

North and South Dakota, Montana and Washington, of school sections 16 and 36, with the special provision that the same shall not be subject to any entry whether surveyed or unsurveyed, was a compact with the states that could not be affected by a subsequent act amending the general law applicable to such grants in other states, whereby settlements prior to the survey in the field were given precedence and the states compelled to accept lieu selections of the lands.

ESTOPPEL—AGAINST STATE—PLEADING. In an action by the state to recover possession of part of a school section, homesteaded by the defendant, an answer alleging allowance of defendant's homestead application and that he had made improvements on the land with the knowledge and consent of the state, is insufficient to support an estoppel against the state.

Appeal from a judgment of the superior court for Skagit county, Joiner, J., entered March 29, 1911, dismissing an action of ejectment, upon overruling a demurrer to an affirmative defense. Reversed.

*The Attorney General* and *R. E. Campbell, Assistant,* for appellant.

*John Arthur,* for respondents, cited, among other authorities: *Heydenfeldt v. Daney Gold & Silver Min. Co.,* 93 U. S. 634; *State v. Johanson,* 26 Wash. 668, 67 Pac. 401; *Terry v. Megerle,* 24 Cal. 610; *Rooker v. Johnston,* 49 Cal. 3; *Finney v. Berger,* 50 Cal. 248; *Medley v. Robertson,* 55 Cal. 396; *Bullock v. Rouse,* 81 Cal. 590, 22 Pac. 919; *McNee v. Donahue,* 142 U. S. 587; *United States v. Montana Lumber & Mfg. Co.,* 196 U. S. 573; *United States v. Bonners Ferry Lumber Co.,* 184 Fed. 187; *Cooper v. Roberts,* 18 How. 173; *Beecher v. Wetherby,* 95 U. S. 517; *Minnesota v. Hitchcock,* 185 U. S. 373; *State of Minnesota v. Bachelder,* 1 Wall. 109; *State of Washington v. Kuhn,* 24 Land Dec. 12; *Todd v. State of Washington,* 24 Land Dec. 106; *Noyes v. State of Montana,* 29 Land Dec. 695; *Black Hills National Forest,* 37 Land Dec. 469; *State of Montana,* 38 Land Dec. 247; *Balderston v. Brady,* 17 Idaho 567, 107 Pac. 493; *Sherman v. Buick,* 93 U. S. 209; *Layton v. Farrell,*

11 Nev. 451; *Ivanho Min. Co. v. Keystone Consol. Min. Co.*, 102 U. S. 167; *United States v. Curtner*, 38 Fed. 1; *Missouri, Kan. & Tex. R. Co. v. Kansas Pac. R. Co.*, 97 U. S. 491; *Holmes v. United States*, 118 Fed. 995; *Clemmons v. Gillette*, 33 Mont. 321, 83 Pac. 879, 114 Am. St. 814; *Abel v. Hansen*, 62 Wash. 492, 114 Pac. 182; *Gauthier v. Morrison*, 62 Wash. 572, 114 Pac. 501.

MORRIS, J.—The state brought this action to recover possession of, and quiet title to, land in section 36, township 34 north, range 7 east; alleging that it became the owner, under and by virtue of the grant from the United States as contained in the enabling act of February 22, 1889, and that respondents are wrongfully in possession. Respondents answered, alleging a settlement upon the land in 1902; that the title to the land was then in the United States; that, on April 25, 1906, the plat of said land was filed in the local land office; and that respondent Edward R. Whitney on said day filed his homestead application, which was allowed. Respondents further allege the making of improvements upon the land with the knowledge and consent of the state, and claim an estoppel against any assertion of title on the part of the state. A demurrer was interposed to this defense, which was overruled, and thereafter the case was dismissed. The answer and the demurrer properly raising all the questions of law involved in the case, the state has appealed, and we are now called upon to review the questions of law submitted by the demurrer.

The questions to be determined by this appeal involve two main propositions: The nature and extent of the grant to the state, as contained in the enabling act of 1889; and the intent and effect of the act of Congress of February 28, 1891, as restricting or modifying this grant. The state bases its title upon the enabling act of February 22, 1889, as found in 25 Stats. at L. 676. Sections 10 and 11 are as follows:

"Section 10. That upon the admission of each of said

states into the Union, sections numbered sixteen and thirty-six in every township of said proposed states, and where such sections, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said states for the support of common schools, such indemnity lands to be selected within said states in such manner as the legislature may provide, with the approval of the secretary of the interior: Provided, That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military, or other reservations of any character, be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.

"Section 11. That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than ten dollars per acre, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulation as the legislature shall prescribe, be leased for periods of not more than five years, in quantities not exceeding one section to any one person or company; and such land shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only."

By these two sections, the state contends the Federal government made a present grant of sections 16 and 36 in each township to the state of Washington, upon its admission into the Union; and that, although many of these lands were then unsurveyed, the title passed and vested in the state upon its admission, as of the date of the grant; and all that remained for the Federal government to do thereafter was to extend its surveys over these sections and thus identify

them. An examination of the different acts under which Congress has granted lands to the different states, beginning with that to Indiana in 1816, will disclose that, in the act of 1889, under which the states of North and South Dakota, Montana and Washington came into the Union, Congress has, for the first time, in prescribing the conditions of the grant, provided in § 11: "and such land shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only."

Prior to the grant to California in 1853, the words used to indicate the grant were "shall be granted." These words have uniformly been held to signify the intention of Congress to make a grant *in futuro*, to become effective when the lands were subject to identification by survey. In the California act, and in that of Nevada and Nebraska, the words used were, "shall be and are hereby granted." In 1875, in the grant to Colorado, Congress for the first time made use of words indicating its purpose, as we view it, to change from a grant *in futuro* to a grant *in praesenti*, by employing the words "are hereby granted." This act was followed by the act in question when, in addition to making a grant *in praesenti* by using the words of the Colorado act, "are hereby granted," the further provision was made, that such land should not be subject to any form of entry under the land laws of the United States.

We cannot conceive how Congress could have employed stronger language to indicate its purpose and intention to devest the United States of all title in these lands, and grant them to the several states for school purposes. We must assume that, in changing its language from words of future grant, as in the earlier acts, to the words employed in this act, it did so advisedly, and sought in the restriction against any form of entry, as found in § 11, to indicate its intent to pass to the states all title and control over these lands,

save the right of entry for the purpose of survey. That the words "hereby granted" indicate a grant *in praesenti*, and pass, not a special or limited interest in the land, but are words of absolute donation and vest a present title, subject only to survey to give precision to the grant and attach it to any particular tract, is, to our minds, established by the Federal cases reviewing such language as applied to grants from the Federal government, as held in *Missouri, Kan. & Tex. R. Co. v. Kansas Pac. R. Co.*, 97 U. S. 491; *St. Paul & Pac. R. Co. v. Northern Pac. R. Co.*, 139 U. S. 1. In the latter case it is said:

"The language of the statute is 'that there be and hereby is granted' to the company every alternate section of the lands designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future . . . This is the construction given to similar grants by this court, where the question has been often considered; indeed, it is so well settled as to be no longer open to discussion. *Schulenberg v. Harriman,* 21 Wall. 44, 60; *Leavenworth, Lawrence &c. Railway Co. v. United States,* 92 U. S. 733; *Missouri, Kansas &c. Railway Co. v. Kansas Pacific Railway Co.,* 97 U. S. 491; *Railroad Co. v. Baldwin,* 103 U. S. 426. The terms of present grant are in some cases qualified by other portions of the granting act, as in the case of *Rice v. Railroad Co.*, 1 Black, 358; but unless qualified they are to receive the. interpretation. mentioned."

The above language is quoted in the subsequent case of *United States v. Southern Pac. R. Co.*, 146 U. S. 570, where, in construing a grant to the Atlantic & Pacific Railroad Company, made in 1866, and one to the Southern Pacific Railroad Company, in 1871, wherein the same lands were contained, it was held, that, notwithstanding the Atlantic & Pacific did not construct its line, and its rights were forfeited and the lands restored to the public domain by the act of July 6, 1886, the Southern Pacific could not claim title to the lands by virtue of its grant and the construction

of its road, because the grant could take effect by relation
only as of the date in 1871, and at that time and for nearly
five years theretofore, the title to these lands had been in the
Atlantic & Pacific, and that, even if Congress had in terms
expressed an intent to that effect in a subsequent act, it
was not competent by such legislation to devest the rights
already vested in the Atlantic & Pacific.   The same rule is
announced in *Railway Co. v. Alling*, 99 U. S. 463, and in
*Deseret Salt Co. v. Tarpey*, 142 U. S. 241, where it is said,
in construing the Union Pacific grant there involved:

"By the terms of the act making the grant the contention
of the defendant is not supported.   Those terms import the
transfer of the present title, not one to be made in the future.
They are that 'there be and is hereby granted' to the com-
pany . . .   No partial or limited interest is designated,
but the lands themselves are granted, as they are described
by the sections mentioned.   Whatever interest the United
States possessed in the lands was covered by those terms, un-
less they were qualified by subsequent provisions."

We find the same principle announced in *Leavenworth etc.
R. Co. v. United States*, 92 U. S. 733.   In construing the
act of March 3, 1863, granting alternate sections of land
to the state of Kansas for the purpose of aiding in the con-
struction of certain railroads and telegraphs in that state,
the language of the grant was, "that there be and is hereby
granted to the state of Kansas."   In defining the grant, the
court said it should neither be enlarged by ingenious reason-
ing nor diminished by strained construction.

"It creates an immediate interest, and does not indicate a
purpose to give in future.   'There be and is hereby granted'
are words of absolute donation, and import a grant *in
praesenti*.   This court has held that they can have no other
meaning; and the land department, on this interpretation
of them, has uniformly administered every previous similar
grant (citing cases).   They vest a present title in the state
of Kansas, though a survey of the lands and a location of
the road are necessary to give precision to it, and attach it
to any particular tract.   The grant then becomes certain,

and by relation has the same effect upon the selected parcels as if it had specifically described them."

These, and other cases that might be cited, sufficiently indicate the rule applied to grants of this character by the supreme court of the United States, that such grants are *in praesenti*, and that, when the sections granted are definitely located by survey, the grant takes effect by relation as of the date of the act of Congress, and passes the title as fully as though the sections had been capable of identification. *Van Wyck v. Knevals*, 106 U. S. 360.

This principle, as now applied, while not directly involved in any case heretofore submitted to this court, has been recognized and approved in *Wheeler v. Smith*, 5 Wash. 704, 32 Pac. 784, where, in construing the language of the grant in the enabling act, it was held that § 10 of that act made a present grant of sections 16 and 36, to take effect as soon as the state was organized. In *State v. Johanson*, 26 Wash. 668, 67 Pac. 401, in construing the various acts under which Congress had indicated its grant of school lands to the state, it was asserted that the purpose of such grants was that the state might have sections 16 and 36 for school purposes upon its admission into the Union, or any equal quantity of land, should it be found that the government could not for any reason grant these two sections to the state when the state should be admitted. See, also, *Northern Pac. R. Co. v. Miller*, 20 Wash. 21, 54 Pac. 603.

In *Balderston v. Brady*, 17 Idaho 567, 107 Pac. 493, in defining the power of the board of state land commissioners to relinquish the state's title to sections 16 and 36, the court took occasion to refer to our enabling act and the nature of the grant thereby created, and while it was conceded by the court that what it then said was collateral and incidental to the point, and therefore of no authoritative value, yet the language is so pertinent, and the reasoning so clear and forceful upon the issue here presented, that we quote it for

its argumentative force.   At page 583 of its opinion, the court says:

"There is nothing in the entire admission bill which negatives the idea of a present grant.   The grantee was in existence at the time of the passage of the act, and the lands were in the state, some surveyed and others unsurveyed.   The fact, however, that the land was not surveyed could make no difference where the numbers of the sections were specifically given.   The title to unsurveyed lands may be as readily conveyed as that to surveyed lands.   It is a maxim of law that that is certain which is capable of being made certain . ∴ . All that remained to be done in order to identify these lands on the ground was to have the survey extended over them. The description in the grant was definite and certain.   So far as we are aware, it has been the uniform holding of the supreme court of the United States that such grants are grants *in praesenti*, and immediately vest title in the grantee. The principle if not the only exceptions to this rule are *Heydenfelt v. Daney, G. & S. M. Co.*, *supra; Hall v. Russell*, 10 U. S. 503, 25 L. Ed. 829, and *Rice v. Minn. & N. W. R. Co.*, 66 U. S. 358, 17 L. Ed. 147.   The *Heydenfelt* case so far as we can find has never been referred to by the supreme court but once (*New York Indians v. United States*, 70 U. S. 18, 18 Sup. Ct. 531, 42 L. Ed. 927), and it was there mentioned as one of the rare exceptions to the general rule in construing land grants.   The cases to the contrary are too numerous to attempt to collate them all (citing many cases). A holding that the state, hampered as it always is in such matters, was intended to run a race with settlers, land scrip brokers, railroad companies, and timber and stone land grabbers to secure the remnant and refuse of the public domain as lieu and indemnity lands for all its best and most valuable school land sections 16 and 36, would render sections 4 and 5 of the admission bill only a delusion and an idle declaration.   There remained about forty-four million acres to survey.   If title vested in the state to the school sections only that had been surveyed, the state was getting merely the barest contingency for the unsurveyed sections, notwithstanding the declaration in the act that, whether surveyed or unsurveyed, such lands should not be subject to any kind of entry."

The situation in Washington as to unsurveyed lands was similar to that in Idaho, and if its title vested only to the lands surveyed at the time of its admission, and to such other lands as, when subsequently surveyed, had not been taken under some form of public entry, then the bounty of the Federal government was a notable instance of generosity in reserving to the state only such lands as were of insufficient value to tempt the locator under public entry; for it is a matter of general knowledge that, long before the government had or could extend its survey over the unsurveyed lands in this state, all such lands as were valuable for any purpose had long since been located under some form of public entry.

Coming now to an examination of the case of *Heydenfeldt v. Daney Gold & Silver Min. Co.*, 93 U. S. 634, urged by respondent as strongly sustaining the judgment, the language of the act then under construction, § 7 of the act of March 21, 1864, 13 Stats. at Large, 30, was:

"And be it further enacted that sections numbered 16 and 36 in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter section, and as contiguous as may be, shall be, and are hereby, granted to said state (Nevada) for the support of common schools."

It was held that, because of the words of qualification in said section, a restriction was made upon a present grant, and that it must be held that it was the intention of Congress to indicate only a grant *in futuro*. It was frankly admitted by the court that the language of the section was ambiguous, and that there could be no reconciliation if the words used received their usual meaning and were held to be words of present grant. The court then asserts that its interpretation, although seemingly contrary to the letter of the statute, is really within its reason and spirit, and then goes on to say that, because of their great mineral wealth, Congress intended lands in Nevada containing mineral should be disposed of

differently from agricultural lands, although no method of doing so had yet been provided; and that to secure adequate protection to those engaged in mining was the purpose of the qualification. That is, as we understand the reasoning, if upon survey of any section 16 or 36, it should be found that such lands were then claimed under mining location, or had in some way been disposed of for such purposes, it would be the policy of the general government to protect such locations, and the state must select other lands equivalent thereto; the court adding: "The whole country is interested in the development of our mineral resources, and to secure it adequate protection was required for those engaged in it;" and then it is shown such protection was granted under the act of July 26, 1866, under which the United States had disposed of the land in question as mineral land, prior to its survey. It does not seem to us that the reasoning of the court, as applied to mineral lands and the necessity for furnishing adequate protection to those engaged in mining, which is the basis of the decision in the *Heydenfeldt* case, should apply to purely agricultural lands taken under homestead entry, such as those we are now dealing with. The *Heydenfeldt* case was decided in 1877. Our enabling act was approved February 22, 1889, and was the first Federal grant of lands to new states subsequent to the decision in that case. Could we not assume that, at the time it chose the language of our enabling act, Congress had in mind the decision in the *Heydenfeldt* case, and because thereof incorporated into § 11:

"Such land shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States whether surveyed or unsurveyed, but shall be reserved for school purposes only."

Whether the decision in the *Heydenfeldt* case had any influence over Congress or not in choosing its language in § 11, what other construction can be given to these words than that Congress meant to emphasize its intention to make a present

grant, and to put it beyond any future controversy or necessity of construction by courts or land departments, that the United States did forever thereby relinquish all its title, and such lands should thereafter be subject to no form of entry under Federal sanction, whether surveyed or unsurveyed? We therefore hold that the words of grant in our enabling act are words of present grant, and that when, by the adoption of its constitution, the state affirmed the provisions of the enabling act and such constitution was approved by the United States, and the state of Washington thereupon fully admitted into the Union, the grant defined in the enabling act took effect as of its date, and passed the entire title of the United States as fully and completely as though such sections 16 and 36 had been previously surveyed and were then capable of exact identification.

This brings us to the second question in the case, the effect of the act of 1891, as a modification or restriction upon the enabling act. The act of February 28, 1891 (26 Stats. at L. 796), was an amendment of the act of February 26, 1859 (11 Stats. at L. 385), and so far as is here material, is as follows:

"Where settlements with a view to preemption or homestead have been or shall hereafter be made, before the survey of the lands in the field which are found to have been on sections 16 or 36, those sections shall be subject to the claims of such settlers; and if such sections, or either of them, have been or shall be granted, reserved or pledged for the use of schools or colleges in the state or territory in which they lie, other lands of equal acreage are hereby appropriated and granted and may be selected by said state or territory in lieu of such as may be thus taken by preemption or homestead settlers. . . . That the lands appropriated by the preceding section shall be selected from any unappropriated, surveyed public lands . . . within the state or territory where such losses or deficiencies of school sections occur . ."

The act of 1859 was a general act relating to preemptions, and it was therein provided that:

"Where settlements with a view to preemption have been made before a survey of the lands in the field which are found to have been made on sections 16 and 36, those sections shall be subject to the preemption claim of such settler."

Provision was then made for the appropriation of lieu lands. This act being general in its nature, there could be no doubt that, when Congress in 1889 passed our enabling act, which was unquestionably a special act applying only to the states of North and South Dakota, Montana, and Washington, providing that sections 16 and 36 should not be subject to entry under any land laws of the United States, this worked an exception and withdrew the lands in these four states from the operation of the general act. This was the construction placed upon these two acts by the secretary of the interior February 20, 1890, L. & R. 84, p. 209, holding that the language of the acts being in direct conflict, the latter should prevail and the grants to the four states named in the special act should be determined and governed by such act. Subsequently, and on April 22, 1891, the secretary held that the amendatory act of 1891 should control, upon the ground that it was intended by the latter act to provide a uniform rule applicable to all the states and territories having grants of school lands. If, however, we are correct in our holding that the United States had, prior to the act of 1891, parted with its title and control over these two sections, except for the purpose of identification by survey, Congress could thereafter pass no law affecting such lands, as they had already been severed from the public domain by the enabling act and the admission of the state thereunder. The language of Secretary Noble in construing these two acts (February 26, 1859, and the enabling act of February 22, 1889), as above referred to, in his first ruling, is so apt upon the contention with which we are now dealing that we quote it:

"The terms of these two laws are so directly opposed to each other, and the language of the latter specific act is so

clear and positive, that it seems impossible to avoid the con-
clusion that it was the intention of the lawmakers that the
provisions thereof should take the place of the former gen-
eral law on the subject. If the language used in this grant-
ing act were uncertain or ambiguous, making it difficult to
determine the intent of the legislature, we might be justified
in looking outside of and beyond said act for assistance in
determining the meaning of the words used. I am of the
opinion that no such necessity exists here, and that the lan-
guage used gives no occasion for construction."

We fail to find anything in the act of 1891 to destroy
the force of this reasoning, or its application. The only
effect of the amendment of 1891 was to extend the provisions
of the act of 1859 to homestead as well as preemption entry,
and was applicable to all lands then within the public do-
main. It could not, however, apply to lands previously with-
drawn from the public domain and, either by special or gen-
eral grant, passed under the dominion of others, either in-
dividuals or states. Again, it will be noted that the act of
1891 is a general act, making no reference by its terms to
the special or enabling act of 1889. It has uniformly been
held that a general act will not repeal a prior special act
unless the intent to so repeal is clearly manifest. Assuming,
then, that the two statutes have the same subject, the one
being special and the other general, there can be no impli-
cation of an intent to repeal the special act by the latter
general act, unless it is apparent that the two acts cannot
stand together, and effect be given to both. There is no
difficulty in applying this general rule to these two acts.
The special act is intended to apply to a particular situation
in a particular and designated locality only. It is not in-
tended as a general law, but by its terms is limited in effect
to the selections with which it deals and the localities it de-
scribes. The general law has no limitation. It applies
wherever there are lands within the public domain subject to
its terms. There is no conflict between the two, nor is there

an impossibility of construing the two so that both shall stand and be fully effective.

"Repeals by implication are not favored, and a statute will not be construed as repealing a prior act on the same subject, in the absence of express words to that effect, unless there is an irreconcilable repugnancy between them, or unless the new law is evidently intended to supersede all prior acts on the matter in hand, and to comprise in itself a sole and complete system of legislation on that subject." *Callvert v. Winsor*, 26 Wash. 368, 67 Pac. 91.

Various expressions of the same rule are to be found in the authorities cited in the *Callvert* case, and in *Tacoma Land Co. v. Pierce County*, 1 Wash. 482, 25 Pac. 904; *State ex rel. Arnold v. Mitchell*, 55 Wash. 513, 104 Pac. 791; 26 Am. & Eng. Ency. Law (2d ed.), 739-741; 36 Cyc. 1151; Lewis, Sutherland, Stat. Constr., §§ 268-274; Endlich, Interpretation of Statutes, 152; Black, Interpretation of Law, 116.

There is no irreconcilable repugnancy between the two acts, and it seems to us absurd to say that, in amending an act whereby the right of homestead entry was extended to lands theretofore subject only to preemption, Congress intended to repeal an enabling act under which four states were admitted into the Union. The two subjects are so dissimilar that it cannot be held, in the absence of any clear expression to that effect, that, in the passage of the latter act, Congress had the former in mind, and was intending to withdraw the special exception granted these four states; and that having created an exemption from any form of public entry as to sections 16 and 36, as one of the conditions of the proposal under which the privilege of admission was extended to the states, as soon as this proposal was accepted by the people and the constitutions they had framed had been approved, and thus a solemn compact entered into between the states and the United States, whereby each contracted to hold inviolate the rights of the other, Congress sought to withdraw any portion of its proposal and to again restore these two

sections to the public domain.   To so hold is to our mind
to accuse Congress of bad faith.

Neither can we accede to the contention that Congress
could, by subsequent enactment, restrict or change the grant
made in the enabling act.   Neither upon principle nor au-
thority can such a contention be sustained.   In *Leavenworth
etc. R. Co. v. United States, supra,* it was held that, where
the right of an Indian tribe to the possession and use of
certain lands as long as it might choose to occupy them was
assured by treaty, Congress could not subsequently make
an absolute grant of the lands to aid in building a railroad;
that to do so would be to violate an express stipulation not
within a grant of land in general terms, and that "specific
language leaving no room for doubt as to the legislative
will, is required for such a purpose;" affirming the doctrine
of *Wilcox v. Jackson,* 13 Pet. 498, and quoting approvingly:

"We go further, and say, that whensoever a tract of land
shall have once been legally appropriated to any purpose,
from that moment the land thus appropriated becomes
severed from the mass of public lands; and that no subse-
quent law, or proclamation, or sale, would be construed to
embrace, or operate upon it; although no reservation were
made of it."

The same doctrine is adhered to in *Beecher v. Wetherby,*
95 U. S. 517, where a contest over the possession of logs
cut on section 16 arose between the plaintiff, who claimed to
be the owner of the logs by virtue of sundry patents of the
land from which they were cut issued to him by the United
States in October, 1872, and the defendant, who asserted
ownership of the logs under patent of the land issued by the
state of Wisconsin in 1870.   The question for determination,
therefore, was, which of these patents transferred the title
to the land.   The state asserted its title to section 16 under
the compact upon which it was admitted into the Union,
under which section 16, in every township not otherwise dis-
posed of, "shall be granted" to the state for the use of

schools.    The court, after referring to the proposition respecting grants of land contained in the enabling act, and the acceptance of these propositions by the people of the state in framing a constitution, subsequently ratified by the United States, as forming an unalterable compact, goes on to say:

"It was, therefore, an unalterable condition of the admission, obligatory upon the United States, that section sixteen (16) in every township of the public lands in the state, which had not been sold or otherwise disposed of, should be granted to the state for the use of schools.    It matters not whether the words of the compact be considered as merely promissory on the part of the United States, and constituting only a pledge of a grant in future, or as operating to transfer the title to the state upon her acceptance of the propositions as soon as the sections could be afterwards identified by the public surveys.    In either case, the lands which might be embraced within those sections were appropriated to the state.    They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted.    All that afterwards remained for the United States to do with respect to them, and all that could be legally done under the compact, was to identify the sections by appropriate surveys; or, if any further assurance of title was required, to provide for the execution of proper instruments to transfer the naked fee, or to adopt such further legislation as would accomplish that result.    They could not be diverted from their appropriation to the state."

So in *Busch v. Donohue,* 31 Mich. 480, Cooley, J., says, "A grant by Congress to a state is no more subject to be recalled at the will of Congress than a grant to an individual."    To the same effect are:    *Rutherford v. Greene's Heirs,* 2 Wheat. 196; *State ex rel. Kittel v. Jennings,* 47 Fla. 302, 35 South. 986; *St. Paul etc. R. Co. v. Winona etc. R. Co.,* 112 U. S. 720; *McGee v. Mathis,* 4 Wall. 143; *Fletcher v. Peck,* 6 Cranch 87; *Terrett v. Taylor,* 9 Cranch 43; *State v. Delesdenier,* 7 Tex. 76; *Spaulding v. Martin,*

11 Wis. 272; *Courtright v. Cedar Rapids & M. R. Co.*, 35 Iowa 386; *County of Cass v. Morrison*, 28 Minn. 257, 9 N. W. 761; *United States v. Curtner*, 38 Fed. 1, and many others.

We cannot now make further reference to the authorities relied upon by respondents to sustain the judgment. They have been studied and regarded with reference to the rules therein announced. In so far, however, as in the California cases, they would seem to indicate contrary conclusions to those we have announced, we prefer not to follow them, based as they are upon stipulations differing from those we have considered as establishing the decision we have reached.

Respondents submit no argument or authority in support of the plea of estoppel. We therefore do not discuss that feature of the answer, further than to say there could be no estoppel as against the state by reason of the facts pleaded.

The judgment is reversed, and the cause remanded with instructions to sustain the demurrer.

DUNBAR, C. J., CROW, ELLIS, and CHADWICK, JJ., concur.