## UNITED STATES v. CLARK.

(Circuit Court of Appeals, Ninth Circuit. May 22, 1905.)

No. 1,070.

1. PUBLIC LAND—FRAUDULENT ENTRY—BONA FIDE PURCHASER.

While the United States is entitled to cancel fraudulent land entries as against the entrymen and innocent purchasers prior to the issuance of a patent to the land, during which time the legal title remains in the government, after the entry is confirmed and title vested by the issuance of a patent, the government cannot repudiate the same and recover the land for such fraud, as against an innocent purchaser for value.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 323–326, 332.]

2. SAME—EVIDENCE.

In an action by the United States to recover land alleged to have been entered under the stone and timber acts by the alleged fraud of the entrymen, evidence *held* to establish that defendant, who purchased the land after patent issued, was a bona fide purchaser for value.

Gilbert, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Montana.

For opinion below, see 125 Fed. 774. See, also, 129 Fed. 241.

This suit was brought by the United States to obtain a decree annulling 82 patents for timber lands in the state of Montana, theretofore issued under the act of Congress of June 3, 1878, c. 151, 20 Stat. 89, as amended August 4, 1892, c. 375, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1545], and certain incidental relief.

By its bill the complainant alleged that on January 1, 1898, it was the owner in fee of the lands therein specifically described by government subdivisions, aggregating about 11,480 acres, alleged to be of the value of $10,000 and upwards; that they were of such character that the same might be sold to citizens of the United States, or persons who had declared their intention to become such, in quantities not exceeding 160 acres to any one person or association of persons, at the minimum price of $2.50 per acre, under and in pursuance of the provisions of the acts of Congress already mentioned, but that such citizens or persons, as a condition precedent to the purchase of the lands, were, by the terms of said acts of Congress, required to file a written statement in duplicate, to be verified by the oath of each applicant, setting forth, among other things, that he did not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; that he had not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons, whomsoever, by which the title he might acquire from the government should inure, in whole or in part, to the benefit of any person except himself; that at some time subsequent to January 1, 1898, one R. M. Cobban, claiming to act for the use and benefit of the defendant in so doing, set about the business of procuring the titles to and possession of the lands described in the bill, and that, in pursuance of such avowed purpose, Cobban entered into a contract in writing with one C. L. Griswold, bearing date May 22, 1899, for the expressed purpose of obtaining lands from the complainant under the said acts of Congress, and which purpose could only be carried out and accomplished by procuring false and fraudulent statements in writing, and under oath, and false and fraudulent proofs to be reduced to writing, and sworn to and subscribed by the parties who should enter the lands in parcels not exceeding in the aggregate 160 acres to each; that Cobban associated with himself one John B. Catlin in and about the said business, and that Cobban, Griswold, and Catlin, by and through themselves and others, examined the lands, procured various persons of both sexes, for hire, to enter the same under said acts, paying their expenses and those of their witnesses, and paying the price required to be paid at the proper land offices of the United States within the jurisdiction of which such parcels of land were respectively situated; that after such sworn statements were made by the persons so employed, and the final proofs made, and the money paid for witnesses' expenses, entrymen and entrywomen's expenses, land office fees, and the price required by law, the several entrymen and entrywomen who had thus acted were paid compensation by Cobban, who, after the several parcels had been respectively entered, took deeds to himself covering the said respective parcels of land from the entrymen and entrywomen, and thereafter conveyed the same to the defendant, Clark; that the respective applications of the parties for the lands in question, and the proofs made in support of them, were all false and fraudulent, in that each of the applicants applied to purchase on speculation, and did not, in good faith, purchase the same for their own exclusive use and benefit, and in that each of them had made an agreement with another person by which the title acquired from the government should inure wholly to the benefit of another. The bill alleges that the defendant Clark "well knew, in a general way, if not in detail, at the time said conveyances of all of said lands were made to him by said Cobban, the facts hereinbefore stated, and well knew, and had good cause to know, that the said lands had been entered in violation of the laws of Congress under which said entries were made, and that the said several parties had entered the same for hire and upon speculation, and for the purpose of enabling him, the said defendant,

to procure title to the same by evasion and violation of said laws of Congress." The bill also shows that after the deeds from Cobban to the defendant had been executed, and prior to the commencement of the suit, the United States issued to the various entrymen and entrywomen its patents for the respective tracts of land so entered by them, and for which it had issued to them respectively its certificates of purchase prior to their respective deeds to Cobban. The prayer of the bill is for a decree canceling the respective patents, and adjudging the complainant the owner in fee of all of the lands covered by them, and of all timber and logs, if any, which may have been cut thereon or removed therefrom, and of all stone that may have been quarried or removed therefrom, and that the defendant be required to account to the complainant touching the value of any timber or stone which may have been cut or quarried or removed from the premises since such alleged fraudulent entry, and that the pretended title of the defendant to the lands be decreed to be void.

The answer of the defendant admitted the alleged ownership of the complainant on the 1st day of January, 1898, of all of the lands embraced by the bill, except one specified parcel, concerning which the defendant averred he had no knowledge or information, and as to which he disclaimed any right. All of the other land covered by the bill is admitted by the answer to be of such character that it was subject to entry under the acts of Congress mentioned, and under the conditions stated in the bill. The answer denies that Cobban ever claimed or pretended to act for the defendant's use or benefit, or that he ever did in fact so act, in the business of procuring the title to or the possession of any lands from the complainant or from any other person, and denies that, in pursuance of any agreement between Cobban and the defendant, any lands were ever bought or procured or purchased, except as specifically stated in the answer. In respect to the averments of the bill regarding the agreements between Cobban and Griswold, the answer avers on the information and belief of the defendant that those parties did enter into an agreement looking to the acquisition by Cobban of the title to the lands belonging to the complainant, but the answer denies, on the information and belief of the defendant, that such agreement could be accomplished only by procuring false or fraudulent statements in writing, under oath or otherwise, or false or fraudulent proofs. The answer further avers that at the time the defendant acquired title to the lands in question from Cobban he had no knowledge or notice of any contract or agreement between Cobban and Griswold, and that the knowledge of that agreement was only obtained long after he (defendant) had acquired title to the lands. The answer also denied, upon the information and belief of the defendant, all of the averments of the bill in respect to the alleged frauds of the respective entrymen and entrywomen, and, upon like information and belief, denied that any of the entrymen or entrywomen who made entries of the lands in question were compensated therefor by Cobban, and avers the fact to be that Cobban purchased such lands in the usual course of business, became the owner thereof, and thereafter, in the usual course of business, and after he had presented to the defendant an abstract of title duly certified, and after such abstract had been presented to the defendant's counsel and the same had been favorably reported on by such counsel, and only then, did defendant purchase or agree to purchase the lands or any part thereof. The answer further avers that, at the time the lands therein described were purchased by him, final proof had been made in respect to the same by each of the persons to whom a final receipt had been given by the government officers, and that each and all of the persons named in the bill as the entrymen and entrywomen had made final proof to the register and receiver of the Land Office in which such entries were made, had received their final receipts for the purchase price thereof, and that the defendant had no knowledge as to who the entrymen or entrywomen were, but relied on the good faith of the various persons who had made such entries, and upon the good faith, watchfulness, and care of the officers of the Land Office, and upon the final receipts issued by the register and receiver of those offices, and upon the abstract of title, the advice of his counsel, and the deeds showing the conveyances from the original entrymen and entrywomen to Cobban; and that the defendant became a bona fide purchaser of the lands specifically described in the answer for a valuable

consideration, and without notice or knowledge of any fraud, directly or indirectly, upon the part of any person or persons, and thereupon became and is the owner of the said lands. The answer then sets forth specifically, by government subdivisions, the lands purchased by the defendant from Cobban at different times, which includes all of the lands described in the bill, except the particular parcel as to which the defendant disclaimed any right, and excepting also certain described lands as to which the defendant avers that he did not purchase the land, but did purchase from the owner thereof the timber standing thereon, and which timber was purchased by the defendant from Cobban, who was then and there the owner of the lands upon which it stood, in good faith and for a valuable consideration, and without any notice whatever of any fraud upon the part of any one. The defendant by his answer also denies that he knew in any way whatever, general or otherwise, any fact mentioned in the bill, or any fact or circumstance at all to the effect that the entries in the bill mentioned were made in any other than the usual, legitimate, and lawful manner of such entries, or that he ever knew, or ever had any reason to know, that any of such entries had not been made in such legal and legitimate manner, and puts in issue each and every allegation of the bill wherein the defendant is charged with either the knowledge or the commission of any act of fraud, covin, or evasion, or of any violation of any law of the United States. And, as affirmative matter, the answer alleges that the defendant is a citizen of the United States, over the age of 21 years, and a resident of the state of Montana, and that on certain days between June 29, 1899, and June 15, 1900, he purchased from Cobban and his wife, Alice M. Cobban, certain tracts of land specifically described in the answer, which tracts included all of the lands described in the bill, other than those in the answer specifically excepted as above mentioned, and that at the time Cobban sold the same to the defendant he claimed to own the lands, and that he in fact did own them, was in their possession, and exhibited to the defendant good and sufficient abstracts of title to the same, showing him to be such owner, which abstracts the defendant submitted to his attorneys, and was by them advised that the title was in Cobban, whereupon, relying upon such representations of Cobban, upon the abstracts of title, and upon the advice of his attorneys, the defendant purchased the said lands, paying therefor a good and valuable consideration, being the full value thereof according to the market price of such lands in the vicinity of their location, which payments were in lawful money of the United States, and were accepted by Cobban as payment in full for the lands; that the defendant was, at the time of the respective purchases, an innocent purchaser of the said respective parcels of land, and for a valuable consideration, and that he had no information or knowledge of any fact or facts which would lead him to believe that the title to any of the lands was in question, and that he had no notice, either actual or constructive, of any fraud on the part of his grantor, or of any other person whomsoever; that the lands so purchased by the defendant from Cobban, and so deeded to him by Cobban and his wife, comprised all of the lands described in the bill, except the particular parcel as to which the defendant disclaimed any right, title, or interest.

A general replication having been filed by the complainant, a vast amount of testimony was taken upon the issues. The decision of the court below having been adverse to the government upon all of the points involved (125 Fed. 774), it brought the case here by appeal.

Philander C. Knox, Atty. Gen., Marsden C. Burch, Sp. U. S. Atty., Carl Rasch, U. S. Atty., and Fred A. Maynard, Sp. Asst. to U. S. Atty.

Walter M. Bickford and George F. Shelton, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

From the view we take of this case it becomes unnecessary to decide whether all, or any, of the various frauds alleged by the

government to have been committed by Cobban, Griswold, and Catlin, and the respective entrymen and entrywomen, in entering the respective parcels of land in suit and obtaining the government title thereto, were or were not committed. And as it is not, in our opinion, necessary to decide those questions in this case, we think it would be particularly improper to do so because of the fact, of which we are informed by counsel for the government, that there are now pending against those parties, in the United States District Court for the District of Montana, indictments charging them with the commission of the alleged frauds. We shall therefore, for the purposes of our present decision, assume, without deciding, that Cobban, Griswold, Catlin, and the various entrymen and entrywomen did commit the frauds alleged in the bill.

There are, then, but two questions presented by the record, both of which are simple and of easy solution, although they are made the subjects of most elaborate briefs by counsel. The first contention on the part of the government, and the one most strenuously insisted on, is that the appellee is not a bona fide purchaser of the lands in suit, for the reason that at the time of his respective purchases the legal title thereto remained in the government; that he got, at best, but an equitable title under the receiver's receipts issued to the various entrymen and entrywomen, and their conveyances to Cobban, and his conveyances to the appellee, which equitable title the appellee must be held to have known was subject to be defeated by the government, should it afterwards find that the lands were not the subject of disposition under the acts of Congress under which the title was undertaken to be acquired, or should it be found that there was fraud or error in the proceedings taken for the acquirement of such title.

So long as the appellee held the equitable title only, the contention on the part of the government is undoubtedly well founded, was not questioned by the court below, and is not questioned by the counsel for the appellee. Indeed, it could not be successfully questioned, for it is the well-established doctrine of the courts, both supreme and subordinate. Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157, and cases there cited. But in the present case the counsel for the government go further, and insist that the same right continues in the government after the issuance of its patent in confirmation of the sale, not only against the patentee, but also against an innocent purchaser for value of the equity, then possessed also of the legal title. And counsel for the government repeatedly ask in their briefs if it is possible that such a right exists in the government up to the time of the issuance of its patent and does not exist the very day after. We answer yes, for the reason that in the one case the innocent purchaser for value has not the legal title, and in the other case he has. Let us put the counsel's proposition in another way: If it exists the day after the patent is issued, it manifestly continues indefinitely, for neither the statute of limitations nor laches runs against the government. What, then, becomes of the security intended to be given by such an instrument? The innocent holder for value under such a patent

would have absolutely no security. He could never know what day, week, month, or year the government might bring him into court and take away the title, bought in good faith and for value, because of the sins of others, of which he knew nothing. The numerous cases which hold that the receiver's final receipt is but prima facie evidence of the right of the entryman to a patent, and that until the patent is issued the power is vested in the Land Department to set aside the receipt and cancel the entry it evidences, for fraud or error, after notice to the parties in interest, and in this way take away even from an innocent purchaser for value this prima facie evidence of title, do not at all support the proposition that this may be done by a court of equity, as against such innocent purchaser for value, after the Land Department, instead of avoiding, has confirmed the prima facie evidence of title by issuing the government patent, and thus vesting the innocent holder of the equitable title with the legal title as well. In the first place, it would not be equitable to do so. An innocent purchaser for value of an equitable title may always fortify that title by acquiring the legal title, and, when he does so, it is a complete answer in a court of equity to one who asserts only a prior equity. "Strong as a plaintiff's equity may be," said the Supreme Court in the case of Boone v. Chiles, 10 Pet. 177, 209, 9 L. Ed. 388, "it can in no case be stronger than that of a purchaser who has put himself in peril by purchasing a title and paying a valuable consideration, without notice of any defect in it, or adverse claim to it; and when, in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief (9 Ves. 30–4), which a court of equity imparts liberally." See, also, Story's Eq. Jur. §§ 64c, 411, 436; 2 Pom. Eq. Jur. §§ 738–740; Sugden on Vendors (2d Am. Ed.) p. 519; Bassett v. Nosworthy, 2 Leading Cases in Equity, p. 1. As a matter of course, when the government comes as a suitor into a court of equity, its claims appeal to the chancellor with no greater force than do those of an individual under like circumstances. No case has been cited which sustains the proposition of the complainant now under discussion, and we will not be the first to announce it. On the contrary, the precise point here made was presented to the Circuit Court of Appeals for the Eighth Circuit, in the case of United States v. Detroit Timber & Lumber Company, 131 Fed. 668, and, in a well-considered opinion, was there decided against the contention of the government. Judge Sanborn, who delivered the opinion of the court, said:

"The receiver's final receipts were not notice of fraud and perjury in their procurement. They were notice of honesty and legality in the proceedings that induced their issue. They were prima facie evidence that those who received them had the right to patents to the lands, and they raised the legal presumption that entrymen and officers alike had complied with the law. They were notice to the Detroit Company of the power of the Land Department to avoid them for fraud or error before the patents were issued, and of no other defect or danger, and the authorities cited for complainant express no different opinion. The Detroit Company took its equitable title to the timber subject to this notice, and subject to the possible exercise by the Land Department of this power. That department exercised the power, as the legal presumption was that it would exercise it, by affirming the validity

of the voidable titles, and by issuing the patents upon them. Here the effect of the notice from the purchase of the equitable titles ceased. The only reason that purchase gave notice of a voidable title was the fact that it did not acquire the legal title. The moment the legal estate inured to the benefit of the Detroit Company by the issue of the patents without notice of any fraud or irregularity in their procurement, its defense of a bona fide purchase was complete. It contained every essential element of a complete defense except the legal title before the patents were delivered. It was the lack of the legal title, and that alone, that made its defense vulnerable in the Land Office. When the patents had issued, the power of the Land Department had ceased, and the Detroit Company's position was conditioned by every attribute of that of a bona fide purchaser. Conceding that the indispensable elements of such a defense are absence of notice of the fraud or defect, good faith, payment of value, and the legal estate, it is not material at what time or in what order the purchaser acquires them. It is only necessary that they all concur in him at the same time. It is indispensable to this defense that the consideration should be paid before notice of the defect. But it is not essential that it should be paid before or at the time the title is conveyed. It is sufficient if the payment is completed at any time before notice of the defect is received. It is not more essential that the legal title should be secured before or at the time when the consideration is paid. It is enough if it is acquired before notice of the alleged fraud or perjury is fastened upon the purchaser."

These views seem to us to be entirely correct, and we think they sufficiently answer the main point of counsel for the appellant in the present case, which, of course, assumes that the appellee was an innocent purchaser for value of the equitable title to the lands in suit.

But it is also claimed on the part of the government that the appellee was not an innocent purchaser of the equitable title, but, on the contrary, knew or had good reason to know, at the time of his respective purchases, of the alleged frauds on the part of Cobban, Griswold, Catlin, and the respective entrymen and entrywomen. On this point the allegations of the bill are:

"And your orator charges that the said defendant, William A. Clark, well knew in a general way, if not in detail, at the time the said conveyances of all of said lands were made to him by said Cobban, the facts hereinbefore stated, and well knew, and had good cause to know, that the said lands had been entered in violation of the laws of Congress under which said entries were made, and that the several parties had entered the same for hire and upon speculation, and for the purpose of enabling him, the said defendant, to procure title to the same by evasion and violation of said laws of Congress."

In the opening brief of counsel for the appellant this contention is not very strongly urged, but in their brief filed in reply to that of the appellee it is much insisted on, and it is there in effect claimed that the appellee was in fact a party to those alleged frauds. We are of the opinion that the evidence does not sustain either of those contentions. In the first place, if the appellee had been willing to become a party, with Cobban and the others named, to the alleged frauds upon the government, or if Cobban had been acting as the agent of the appellee, as is alleged in the bill, it is passing strange that the appellee should have paid Cobban $217,571.25 for the timber and lands in question, as the counsel for the government admit that he did. Cobban, it is claimed, paid only the government price of $2.50 an acre for the lands, $100 to each of the entrymen and entrywomen, and the incidental fees and expenses, and it

is incredible that a man of brains and of large business affairs, as the record shows the appellee to be, would, if Cobban had been his agent, or if the appellee had been dishonest enough to have joined Cobban in the alleged fraudulent scheme to obtain lands from the government in violation of its laws, have paid him $217,571.25 for what Cobban, in pursuance of the same undertaking, paid but a mere trifle in comparison. It is, we think, incredible that the appellee would have permitted his partner in the fraud to profit so largely at his expense, if he had been a party to it. The evidence, in our opinion, fails to justify the contention of appellant's counsel that Cobban was at any time acting for the appellee, or that the latter was in any way a party to the alleged frauds, or ever heard anything of them until after he had made his purchases and paid his money. It shows that the appellee was a man of large business affairs, engaged in extensive mining operations requiring large quantities of timber, and also engaged in the lumber business on a large scale. He needed timber lands, or, at least, the timber growing upon them. Cobban claimed to own such timber and timber lands. The case shows that the appellee's operations were so extensive that it was necessary for him to operate largely through agents. A man named Wethey was his general manager, and one McLaughlin his timber agent. In their reply brief, counsel for the government contend that the appellee commenced negotiating for the lands in question before he made his purchases. We do not think that the fair conclusion to be drawn from the evidence. It seems that the appellee first authorized Wethey to buy 40,000,000 feet of lumber. Cobban representing that he owned lands containing the required timber, persons were sent by the respective parties to examine the lands and estimate the number of feet of lumber each tract contained. The price to be paid for the land was, according to the agreement between Cobban and the appellee, to be an amount equal to $1.25 for each thousand feet of lumber the land contained; and the method adopted by the parties was that when the respective estimates were made they were submitted to McLaughlin, who, when satisfied of the amount and quality of the timber, would submit an abstract of title to the lands, together with a deed from Cobban, to Mr. Bickford, the attorney of the appellee, and upon a favorable report in respect to the title by the attorney the money was paid over by Wethey, the general manager of the appellee, and the deed to the latter from Cobban delivered. The first two of such deeds were so delivered July 19, 1899, and the next two September 16, 1899. These, according to the evidence, were the only absolute sales, from their inception, by Cobban to the appellee. But subsequently Cobban and the appellee, through his agents, commenced negotiations for additional lumber and timber lands. Cobban wanted the appellee to loan him money, bearing interest, with which to carry on his operations and to acquire additional lands, and to take as security his (Cobban's) deeds covering the lands, the amount of such advances to be at the rate of 50 cents for every thousand feet of lumber on lands acquired by Cobban under scrip locations, and 75 cents a thousand feet for every thou-

sand feet of lumber on other lands, subject to like examination as to the quantity and quality of the timber by the appellee's agents, and to like approval of Cobban's title by the appellee's attorney. That arrangement was agreed to by Cobban and the appellee, and the first of those transactions was consummated November 11, 1899, the next November 13th of the same year, the next two January 9, 1900, the next June 15, 1900, and the last June 16, 1900. Subsequently, by agreement of the respective parties, these mortgages were, for a money consideration, converted into absolute sales. While it is true that the record shows that the appellee knew that some of the money he loaned Cobban was intended to be used by him in acquiring additional lands, it does not show that the appellee knew, or had any reason to know, that he expected to acquire them fraudulently or in any way unlawfully. United States patents cannot be annulled upon mere suspicion of fraud, even if it could be properly held that any such suspicion arises upon this record against the appellee. The rule upon that subject is thus stated by the Supreme Court in the Maxwell Land Grant Case, 121 U. S. 381, 7 Sup. Ct. 1015, 30 L. Ed. 949:

"We take the general doctrine to be that when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition as thus laid down in the cases cited is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

The testimony of the appellee is positive and clear that he knew nothing of the circumstances attending the entries of the various tracts of land in question by the respective entrymen and entry-women or the conveyances from them to Cobban, and that he never suspected that they were obtained by any fraudulent, unlawful, or irregular means, but that, on the contrary, he bought and paid for them in good faith, relying upon the advice of his attorney in respect to the regularity of the proceedings and the validity of the title, and upon his agents as to the quality and quantity of lumber they contained. In these respects the appellee's testimony is corroborated by that of his attorney, general manager, and timber agent. It may be added that the officers of the Land Office where

the entries in question were made testified that they knew of no fraud or irregularities in connection with them, and the entrymen and entrywomen who were examined as witnesses in this case testified to the effect that they had not made any agreement with any person or persons by which the title that they might acquire from the government would inure to the benefit of any other person, nor did they seek to buy the land applied for on speculation, but for their own individual use and benefit. However that may be—a question, as has been said, not necessary to be here determined—we think that the evidence in the present record falls far short of establishing that the appellee knew, or had reason to know, of any such frauds at the time of his respective purchases.

We are of the opinion that the judgment of the court below is right, and it is accordingly affirmed.

GILBERT, Circuit Judge (dissenting). I think there is enough in the record which is before us to show that facts came to the knowledge of the defendant in error and his agents sufficient to put them upon inquiry as to the manner in which the lands were obtained from the United States. The deeds from the various entrymen to Cobban showed that the latter was carrying out a large and comprehensive scheme to obtain the lands. Seventeen of those deeds were made on September 16, 1899, 29 were executed on November 11th, and 22 were executed on November 13th. The deeds also showed that the final receiver's receipts had been issued but a short time before the execution of the deeds. Some were issued but two days before the deeds. Others were issued at intervals of from one week to three or four weeks prior to the deeds. These are significant facts, and indicated a concert of action, of which Cobban was the engineer. The evidence shows, also, that the inspection of these lands by the defendant's agents was contemporaneous with the entries, and that large sums were loaned by the defendant in error to Cobban, to be used by him for the purpose of obtaining title to these lands. There are many other facts and circumstances in the evidence pointing to the conclusion that the defendant in error knew enough of the methods by which the lands were obtained to put him upon inquiry.