[No. 10979.  En Banc.  August 6, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v. HEWITT LAND COMPANY et al., *Appellants*.[1]

COLLEGES AND UNIVERSITIES — LANDS — DISPOSAL—POWERS OF REGENTS—STATUTES—IMPLIED REPEAL. Laws 1862-63, p. 477, incorporating the board of regents of the university, in so far as it empowers the regents as a body corporate to hold and acquire real estate, is a mere definition of the powers of the board of regents, and is impliedly repealed by the whole course and tenor of subsequent repugnant legislation accomplishing a unified system of control of all public lands, whereby the state board of land commissioners is given full supervision and control and power of disposition of all public lands now or hereafter owned by the state and not appropriated by law to any specific public use (Laws 1893, p. 387, § 5; Laws, 1895, p. 527; Laws 1897, p. 229; and Rem. & Bal. Code, §§ 4316-4330); especially in view of the fact that the later acts defined the duties of the board of regents with great particularity, without including the power to hold real estate; the regents being mere agents of the state with no vested rights in the subject-matter of their agency.

PUBLIC LANDS — UNIVERSITY LANDS — PRIVATE DEEDS TO STATE — POWER OF DISPOSAL—STATUTES—CONSTRUCTION. Lands deeded to the territorial board of regents of the university are "public lands"

[1]Reported in 134 Pac. 474.

within the constitution and laws of the state, empowering the state board of land commissioners to dispose of the same; in view of the comprehensive acts of 1893, p. 387, authorizing the first land commission to dispose of all public lands granted to the state . . . for university and all other educational purposes not appropriated to any specific public use, and Laws 1895, p. 527, § 1, including therein all lands acquired by deed of sale or gift; and Laws 1895, p. 107, § 1, creating a university fund to be derived from the proceeds of all granted lands and all lands acquired by the university by purchase or donation.

COLLEGES AND UNIVERSITIES—LANDS—POWER OF DISPOSAL—STATUTES—CONSTRUCTION. No provision of law having conferred power on the territorial board of regents of the university to sell university lands, and that power being later conferred upon the state board of land commissioners, the fact that the state constitution provides for the confirmation of all lands "theretofore" sold by the university commissioners, and that the legislature passed such a confirmatory act (Laws 1890, p. 448), indicates the purpose and intent of the people and legislature to take from the regents all future power to dispose of university lands.

COLLEGES AND UNIVERSITIES—LANDS—DISPOSAL—"SPECIFIC PUBLIC USE"—STATUTES—CONSTRUCTION. Laws 1893, p. 387, § 5, conferring upon the state board of land commissioners the control and power to dispose of all public lands "not appropriated to any specific public use" means lands not occupied, employed or used by the state in the performance of some of its public functions; hence applies to unoccupied university lands, situated fifty miles from the site of the university and not necessary to the present uses of the university or the board in the performance of any of its functions.

PUBLIC LANDS—SALE—"GRANTED LANDS." Const., art. 16, § 4, providing that no more than 160 acres of any granted lands of the state shall be offered for sale in one parcel, has application to lands granted by the United States for public institutions, common schools etc., and not to private grants by individuals.

PUBLIC LANDS—SALE—DEED FROM STATE—VALIDITY—IRREGULARITIES. A state deed of more than 160 acres of university lands, sold in one parcel in violation of Laws 1897, p. 235, is an irregularity only and not void, as between the state and subsequent innocent purchasers for value, where there was no fraud and the law did not provide that such sale would be void, the limitation of the constitution against sales of more than 160 acres in one parcel applying only to lands acquired by Federal grant.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered November 18, 1912, upon findings

in favor of the plaintiff, in an action to quiet title to and to recover possession of lands.   Reversed.

*E. R. York, T. W. Hammond, Gordon & Easterday, George T. Reid, J. W. Quick,* and *L. B. da Ponte,* for appellants.

*The Attorney General* and *R. E. Campbell, Assistant (H. G. Cosgrove,* of counsel), for respondent.

GOSE, J.—The italics in this opinion are our own, unless otherwise indicated.

On July 16, 1866, Thomas Chambers and wife deeded to the "Regents of the University of the Territory of Washington" a part of their donation land claim, 315 acres, situate in Pierce county, Washington.   The deed was in form a common law deed of quitclaim, with habendum and tenendum to the regents "and to their successors in office and assigns." By an act of the territorial legislature, Laws 1862-63, page 477, a board of regents therein named was created "a body corporate and politic, with perpetual succession, under the name of the University of the Territory of Washington, by which they may sue and be sued."   It was also provided that the government of the university should be vested in the board of regents, and that the regents "may hold all kinds of estate, real, personal, or mixed, which they may acquire by purchase, donation, devise, or otherwise, necessary to accomplish the object of the corporation."   On March 4, 1903, the state land commission sold the land thus acquired upon the application of one Henry Bucey, and this action has been begun by the state to eject his successors and to quiet title.

The constitution, art. 16, § 1, provides that:

"All the public lands granted to the state are held in trust for all the people, and none of such lands, nor any estate or interest therein, shall ever be disposed of unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid  .  .  . ; nor shall any lands which the state holds by grant from the

United States . . . be disposed of except in the manner . . . prescribed in the grant . . ."

Section 2 of the same article refers to lands granted for educational purposes, and provides that all sales of school and university land theretofore made might be confirmed by the legislature. The first state legislature passed an act creating a state land commission and defined its duties. It was provided that "said commission shall have general supervision and control of *all public lands now owned by*, or the title to which may hereafter vest in the state, to be registered, leased and sold." The commissioner of public lands was directed to abstract and survey all of the lands *"now owned by the state."* Laws 1890, page 251. In 1893 the legislature passed "an act to provide for the creation of a state board of land commissioners for the management and *disposition of the public lands of the state,"* etc. Laws 1893, page 386. It is provided:

"That the said board of state land commissioners shall have full supervision and control, under the law, of all public lands granted to the State of Washington for common school, university and all other educational purposes; also including lands granted for charitable, reformatory and penal institutions, public buildings; and also all tide lands and harbor line areas, and *all other public lands that are now or shall hereafter be owned by the State of Washington,* so far as the same shall not have been disposed of, *and not appropriated by law to any specific* public use." Laws 1893, p. 387, § 5.

State lands were classified in § 7: "(2) University lands and lieu and indemnity lands therefor; . . . (5) all other lands belonging to the state." At the same session, Laws 1893, page 293, "An act providing for the location, construction and maintenance of the University of Washington," was passed. The object of this act was to relocate the university. By it, the governor of the state was authorized and directed to buy certain land, the title *"to vest in the State of Washington* for the use of the University of Washington." The duties of the regents of the university were defined, and

they were empowered, "after the purchase of the lands by the governor," to sell ten acres in the city of Seattle known as the university grounds; the lands granted by the enabling act were assigned for the support of the University of Washington; a provision was made for the selection and sale of the lands "in the manner prescribed by law for selecting and selling other lands granted to the state." The board of regents were further directed to demand and receive from the board of university land and building commissioners all books, papers, records, and other property in their possession belonging to the University of Washington. There is nothing to indicate an intention on the part of the legislature to leave any real property to the disposition and control of the regents, other than the ten acres then appropriated to a specific use.

In 1895, Laws 1895, page 527, the law relating to the public lands of the state was rewritten. The classification so far as the university lands are concerned is the same as in the former act. Granted lands are defined as follows:

"(a) Common school lands and lieu and indemnity lands therefor. (b) University lands and lieu and indemnity lands therefor. (c) Other educational land grants. (d) Lands granted to the State of Washington for other than educational purposes, and lieu and indemnity lands therefor. (e) All other lands, including lands acquired or to be hereafter acquired by grant, deed of sale, or gift, or operation of law."

The board of state land commissioners is given "full supervision and control, under the law, of all public lands granted to the State of Washington as defined in section one of this act," and authority to manage, lease and dispose of the same. The legislature of 1897 again rewrote the public land law (Laws 1897, page 229). In so far as questions arising in this case are concerned, the act of 1897 does not differ from that of 1895.

Laws affecting the university and its government have been passed at several legislative sessions. The law as it now

19—74 WASH.

is may be found in Rem. & Bal. Code, §§ 4316-4330 (P. C.
413 §§ 27-59). Section 4321 (P. C. 413 § 35), defines the
powers and duties of the regents. There is nothing said in
the seven subsections contained in § 4321 to indicate that the
legislature had in mind the fact that the board of regents
was now holding or had power to dispose of any land. This
section was passed in 1909.

The concrete question presented by the record is whether,
considering the course and tenor of our legislation, the land
acquired by the board of regents in 1866 has become public
land and as such subject to the control and disposition of
the state land officials, or whether the board of regents still
have title in virtue of their corporate being. It will be
noticed that the act of 1893 makes the board of state land
commissioners the successor of the state land commission,
state school land commission, and the state board of equaliza-
tion and appeal. The law provides that:

"From the date of its [the board of state land commission-
ers] assumption of official duties [it shall] possess and exer-
cise over all such lands and areas all authority, power and
functions, and shall perform all the duties which the state
land commission, the state school land commission, etc., had
and exercised." Laws 1893, page 387, § 5.

The *Attorney General* argues that the authority of the
present board of state land commissioners and of the state
land commissioner can be and is no greater than was con-
ferred upon the original officers and boards by the act of
1890.

Taking all the laws to which we have referred, and con-
sidering them as enactments directed toward the accomplish-
ment of a certain thing—that is, a unified system of control
of all public lands—we think the argument of counsel is not
well founded. If the act of 1893 stood alone, there might
be some merit in his contention.

The *Attorney General* insists that the act of 1862-63 is a
special act, and that a special act will not be repealed by a

general law "unless there is an irreconcilable repugnancy between them, or unless the new law is effectively intended to supersede all prior acts on the matter in hand and to comprise in itself a sole and complete system of legislation on that subject." *Callvert v. Winsor*, 26 Wash. 368, 67 Pac. 91. He also cites: *State v. Whitney*, 66 Wash. 473, 120 Pac. 116; *Tacoma Land Co. v. Pierce County*, 1 Wash. 482, 25 Pac. 904; *State ex rel. Arnold v. Mitchell*, 55 Wash. 513, 104 Pac. 791; 26 Am. & Eng. Ency. Law (2d ed.), 739-741; 36 Cyc. 1151; Lewis' Sutherland, Statutory Construction, §§ 268-274; Endlich, Interpretation of Statutes, 152; Black, Interpretation of Law, 116.

There can be no doubt as to the correctness of this rule, but it seems to us that there *is* a repugnancy between the act of 1862-63 and the later acts. It was evidently the purpose of the legislature to give the commissioner of public lands, an office created by the constitution (art. 3, § 1); and the board of state land commissioners, general supervision over *all* public lands. In evident recognition of the fact that such duties must of necessity be varied and manifold as well as changing from time to time, the duties of the commissioner of public lands were not defined in the constitution. It is there provided that: "The commissioner of public lands shall perform such duties and receive such compensation as the legislature may direct." Const., art. 3, § 23. The fact that the act of 1893, Laws 1893, page 293, put the duty upon the governor of receiving a deed to the new university site would further indicate that the legislature did not regard the board of regents as a corporate entity with power to take and hold lands. It must be remembered that no question of private right is involved. That provision of the Laws of 1862-63, page 477, giving to the board of regents the power to "hold all kinds of estate, real, personal or mixed, which they may acquire by purchase, donation, devise, or otherwise, necessary to accomplish the object of the corporation," was, in so far as the state is concerned, a definition of the powers of the

regent body. That body has no powers that are not conferred by statute, and none that the legislature cannot take away or ignore. The legislature having assumed, by various laws, a jurisdiction over all public lands, and having by later enactment defined the duties of the board of regents with great particularity, it would seem to be incontrovertible that the power to hold lands has been impliedly, if not directly, taken away from the board. The old act, although in form an act creating a corporation, is of no higher order than the subsequent acts limiting and defining the duties of the regents. None of the laws defining the power and duties of the regents create an inviolable right of contract. The board of regents are mere agents to do the will of the legislative body. An agent of the state has no vested right in the subject-matter of his agency. If the legislature grants to an officer certain powers, using general terms, and afterwards passes an act complete in itself specifically defining his duties, the first act should be held to be repealed by implication; for, as we have said, the question is one of state policy and not one of private right, and in so far as public officers are concerned "powers" and "duties" are interchangeable terms. This rule is especially applicable in this case, the legislature having by subsequent legislation given to the commissioner of public lands and the board of state land commissioners control over all state lands not appropriated to a specific public use.

But it is insisted that these lands, having come by deed to the corporate body—the board of regents—are not public or university lands within the meaning of the constitution and the several acts of the legislature.

The first land commission was authorized to dispose of:

".  .  .  all public lands granted to the state . . . for university and all other educational purposes; . . . and all other public lands . . . owned by the State of Washington, so far as the same shall not have been disposed of, *and not appropriated to any specific public use; . . .*" Laws 1893, page 387.

"(b) University lands . . . ; (c) other educational land grants; . . . (e) all other lands, including lands acquired . . . by . . . deed of sale, or gift, or operation of law." Laws 1895, page 527, § 1.

A "University of Washington fund" was created in 1895. It is:

" . . . the proceeds from the sales of lands granted to the state . . . for the university, and also the proceeds from the sales of *all lands acquired by the said university by purchase or donation.*" Laws 1895, page 107, § 1.

These statutes are comprehensive, and we must presume that, if the legislature had intended to exempt any particular tract, or any kind of land from its definitions of public lands and leave its disposition and control to the board of regents, it would have done so in terms. The method of acquiring title is not material. The terms of the grant or the use to which the land is put determines its character. In the definition of public lands the legislature has provided that the term shall include "all other lands, including lands acquired by . . . deed of sale, or gift, or operation of law." The law provides for covering all moneys realized from the sale of public lands into the state treasury. If the lands in controversy are not public lands within the meaning of the statutes, and the board of regents still has power to hold lands, it can recover from the state all sums realized from the sale of lands heretofore deeded to the university. The statement of this conclusion carries its own refutation, for it is clearly in contravention of the plain policy of the law.

The further fact that the constitution provides for the confirmation of all lands *theretofore* sold by the university commissioners, and that the legislature passed a confirmatory act (Laws 1890, page 448) also indicates the intent, policy and purpose of the legislature, and of the people at the time the constitution was adopted, to take from the regents all *future* power to control or dispose of university lands. Rem. & Bal. Code, § 6637 (P. C. 477 § 369), provides that:

"Any person . . . to whom has been made a convey-
ance of . . . University land, which conveyance has been
executed . . . by the . . . university commissioners
of the said territory of Washington, or an authorized com-
missioner or regent of the university of said territory . . .
shall have a right of action against the state of Washington
. . to secure a confirmation of title. . . ."

No provision is to be found in the law, or in any law,
providing for a sale of university lands by the board of
regents, whether granted, or acquired by purchase, donation
or gift.

The state relies with confidence upon the case of *Callvert
v. Winsor*, 26 Wash. 368, 67 Pac. 91. That part of the
*Callvert* case which is relied on by the *Attorney General* is
as follows:

"The term 'granted lands,' used in the commissioners' acts
of 1893, 1895 and 1897, undoubtedly refers to lands granted
by the United States for public institutions, common schools,
etc., and not to *private grants by individuals.*"

The text following this quotation clearly demonstrates that
it was the intention of the court to hold that all public lands
are subject to the control and disposition of the state land
commissioner "so far," as is said in the opinion, and in the
law, as "the same was not disposed of and not appropriated
by law to any specific use." Laws of 1893, page 387, § 5.
The act of March 14, 1893, construed in the *Callvert* case,
dealt with lands then appropriated to a specific use. The
words "appropriated by law for any specific public use"
must be given a literal meaning. The general grant of
power to the board of state land commissioners over "*all
other public lands that are now or shall hereafter be owned
by the state of Washington*" makes this construction im-
perative. Appropriated to a specific use means, therefore,
devoted to a certain use; occupied, employed, or used by the
state in the performance of some of its public functions. The
terms "university lands," "capitol lands," are used to desig-
nate lands to be sold, and out of which the maintenance of

the university, the erection of capitol buildings, and other
like objects are to come. In the one case the money to be
realized is to be devoted to a specific use. In the other it is
the land; as for instance, the university campus, the capitol
grounds, land devoted to experimental stations, fish hatch-
eries, etc. Manifestly such lands should not be made sub-
ject to lease or sale, and the legislature has so provided.

It is not contended that the land sought to be recovered by
the state is devoted to a public or specific use. It is fifty
miles away from the university, and, so far as the record
shows, it is not necessary to the present uses of the university,
or to the board of regents in the performance of any of its
functions. The land under consideration in the *Callvert*
case was a ten-acre tract in the city of Seattle that had been
deeded to the state by Mr. Denny and others. The spe-
cial act above referred to (Laws 1893, page 293), and con-
strued in the *Callvert* case, referred *eo nomine* to a specific
parcel of land then appropriated to a public use. This act
antedated the first land commission act. The *Callvert* case
must be construed in the light of this special act of the leg-
islature. When so considered, the decision goes no further
than to hold that, where a particular piece of land has been
appropriated to a public use and the legislature has pro-
vided for its sale by a particular agent, the state land commis-
sioner or the board of state land commissioners cannot sell
it under the general laws. Reference to that case will show
that one of the grounds upon which the decision was based
was that the regents were directed to sell the land. It is
elementary that it is within the power of the legislature to
make the board of regents, or any other body, an agent to
sell any part of its property, even to the exclusion of the
commissioner of public lands. For his duties are to be "de-
fined by law." Const., art. 3, § 23.

That the board of regents has long since ceased to be re-
garded by the legislature as a holder of state lands is fur-
ther emphasized by our ruling in the case of *State v. Seattle,*

57 Wash. 602, 107 Pac. 827, 27 L. R. A. (N. S.) 1188.  In that case the regents had attempted to appropriate a part of the old university grounds for street purposes.  It was held that they could not.  Now, if the board had been a corporate body, within the meaning of the act creating it, and holding the land as a corporate entity, no rule of law that we know of would have defeated the contentions of the city.  The case was decided against the city because it was state or public land over which the regents had no control, except as they were directed by statute.

The briefs of counsel have taken a wide range, but being satisfied that the act of 1862-63, in so far as it put the power of holding or disposing of public lands in the board of regents, is repealed, it is unnecessary to pursue the discussion except to notice the contention of the *Attorney General* that the sale was made in violation of § 4, art. 16, of the state constitution, wherein it is provided that "no more than one hundred and sixty acres of any granted lands of the state shall be offered for sale in one parcel."  If we sustain the state's contention in this respect, the deed is void.  "No more than one hundred and sixty acres of any granted lands of the state shall be offered for sale in one parcel." Const., art. 16, § 4.  Neither an officer of the state nor a board created by statute can violate the fundamental law.  But we have said enough in the body of our opinion to demonstrate the fact that these lands and lands of like character are not referred to in the constitution.

"The term *'granted lands,'* . . . undoubtedly refers to lands granted by the United States for public institutions, common schools, etc., and not to private grants by individuals." *Callvert v. Winsor*, 26 Wash. 368, 67 Pac. 91.

The words "granted lands" have a definite if not a technical meaning.  The term commonly implies, and when used without qualification is taken to mean, lands granted by the Federal government for a specific purpose.  Lands acquired by purchase or gift are not such lands, unless they are so de-

fined by statute. Deeded lands are not, as a rule, conveyed with any fixed purpose or with any limitation; whereas granted lands are given to the state because of an interest that the general government has in the object for which they are granted. They are held as a trust. Const., art. 16, § 1.

Power to sell *all lands* not devoted to a specific use is given to the land department of the state. The statute provides that "no more than one hundred and sixty acres of any school or granted lands shall be offered for sale in one parcel." Laws 1897, page 235. The law nowhere provides that such sales shall be void. As between the state and its vendee, it is possible that the sale of a tract or parcel containing a greater number of acres could be set aside; but here the property has passed into the hands of third parties, purchasers for value and in good faith. No fraud is alleged. There is a wide difference between power or jurisdiction and the irregular exercise of jurisdiction. "The test of jurisdiction is not right decision, but the right to enter upon the inquiry and to make some decision." *King v. McAndrews*, 111 Fed. 860. The constitution puts no limitation on the sale of any lands other than those included in the Federal grants. The legislature might have provided that lands other than the Federal grants should be sold in tracts or parcels of greater or less area. The officers of the state have exercised the power vested in them in an irregular way. In exercising their admitted power, they have ignored or overlooked the letter of the law; instead of offering the land in two tracts, they have offered and deeded it as one tract. As against the interest of those who have come into the possession and ownership of land so sold, a purchaser for value and without fraud on the part of any one, the state cannot be heard to question its conveyance. 32 Cyc. 1058.

Both sides rely upon the case of *Smelting Co. v. Kemp*, 104 U. S. 636, and there is language in that decision that can be quoted by both sides to this controversy, but in its final analysis the case must stand as an authority in favor of the appellants. The court there sustained a patent for 164

acres of mineral land, whereas the law was such that an
entryman could acquire no more than 160 acres. The court
held, there being nothing in the law to prevent an entryman
from purchasing land entered by others and having it pat-
ented in the same instrument, that the patent was not void.
The rule of that case is available to the appellants. A pur-
chaser of land sold by the state or patented by the govern-
ment has a right to presume that all proceedings leading up
to the sale are regular. He is not bound to look beyond the
face of the deed, either to find out whether the department
has strictly complied with the law or rightly decided some
fact, nor is he bound to investigate the conduct of the pat-
entee or grantee. In other words, the patent or deed being
in regular form, the law will not presume that it was obtained
in fraud of the public right.

"The settled rule of law is that jurisdiction having at-
tached in the original case, everything done within the
power of that jurisdiction, when collaterally questioned, is
to be held conclusive of the rights of the parties, unless im-
peached for fraud." *Cornett v. Williams,* 20 Wall. 226.

"This principle is not merely an arbitrary rule of law estab-
lished by the courts, but it is a doctrine which is founded
upon reason and the soundest principles of public policy.
'It is one which has been adopted in the interest of the peace
of society and the permanent security of titles.' *Belles v.
Miller,* 10 Wash. 259, 38 Pac. 1050." *Kizer v. Caufield,* 17
Wash. 417, 49 Pac. 1064.

See, also, *State v. Ort,* 66 Wash. 130, 119 Pac. 21. Unless
fraud is shown, this rule is held to apply to deeds and patents
executed by the public authorities. *King v. McAndrews,
supra; Welsh v. Callvert,* 34 Wash. 250, 75 Pac. 871;
*Boynton v. Haggard,* 120 Fed. 820; *United States v. Clark,*
138 Fed. 294; *Neff v. United States,* 165 Fed. 273; *United
States v. Northern Pac. R. Co.,* 177 U. S. 435. The error
and irregularity attending the sale puts the state in no bet-
ter position than it would be if it had established the fraud
of the original applicant. If it had done so, it would not

defeat the title of these appellants. The principle is well stated in the case of *United States v. Clark*, 138 Fed. 294; *Id.*, 200 U. S. 601. We quote from the syllabus:

"While the United States is entitled to cancel fraudulent land entries as against the entryman and innocent purchasers prior to the issuance of a patent to the land, during which time the legal title remains in the government, after the entry is confirmed and title vested by the issuance of a patent, the government cannot repudiate the same and recover the land for such fraud, as against an innocent purchaser for value."

In the body of the opinion it is said:

"When a government comes as a suitor into a court of equity, its claims appeal to the chancellor with no greater force than do those of an individual under like circumstances."

In *United States v. Detroit Timber & Lumber Co.*, 200 U. S. 321, it is said:

"We do not understand the law to be, . . . that one who enters into an ordinary and reasonable contract for the purchase of property from another is bound to presume that the vendor is a wrongdoer, and that, therefore, he must make a searching inquiry as to the validity of his claim to the property. The rule of law in respect to purchases of land or timber is the same as that which obtains in other commercial transactions, and such a rule as is claimed by counsel would shake the foundations of commercial business. No one is bound to assume that the party with whom he deals is a wrongdoer, and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and paying him full value for the same, acquire the rights of a purchaser in good faith. *Jones v. Simpson*, 116 U. S. 609, 615. He is not bound to make a searching examination of all the account books of the vendor nor to hunt for something to cast a suspicion upon the integrity of the title."

It is only where the department had no jurisdiction, or the lands sold were never public property, or had been previously disposed of, or no provision had been made for their sale, or

they had been reserved, that the deed would be inoperative and void. This being so, the appellants had a right to assume the integrity of the sale under the rule announced in *Smelting Co. v. Kemp, supra.* Patents or deeds from the state are held to be valid or invalid as the jurisdiction or want of jurisdiction to issue them appears on the face of the deed or patent, or when the instrument is read in the light of existing laws.

The cases of *State v. Ort*, 66 Wash. 130, 119 Pac. 21, and *State v. Heuston*, 56 Wash. 268, 105 Pac. 474, are relied upon by appellants. The *Attorney General* insists that these cases are not in point; that we there held no more than that the state was bound by a mistake of fact made by the duly constituted authorities. The *Ort* case strikes deeper than this. While all that is contended for these cases by the *Attorney General* was held in them, the land sold by the state to Ort was in fact timber land. It is said: "The evidence convinces us that each of the two quarter sections did have timber of commercial value thereon exceeding one million feet, and that, under the statute, the timber thereon should have been sold first and apart from the land; . . ." It was then decided that, inasmuch as the purchase price of the land had been paid and deeds had issued, the state must, if it did so at all, set aside the sale upon some equitable principle that would authorize an individual to set aside and declare for naught his executed contract. The constitution covering the sale of timber lands, § 3, art. 16, is quite as explicit as is the statute in this case. It is said: "No sale of timber lands shall be valid unless the full value of said lands is paid or secured to the state." The statute says "No more than one hundred and sixty acres of school or granted land shall be offered for sale in one parcel." Notwithstanding the finding of the court that the land was timber land, the sale was confirmed because the contract had been executed and no fraud had been shown. This holding is in keeping with the established doctrine that, in procedure and in the pursuit of methods, a citizen dealing

with the state in good faith has a right to rely upon the integrity of its officers and upon the validity of its executed contracts.

In discussing this contention we have treated the lands in controversy as if they were school or granted lands within the technical definition of the terms. We have said enough in our opinion to indicate that there may be grave doubt whether the Chambers' tract ever was school or granted lands.

We conclude that the board of state land commissioners had power to dispose of the lands in controversy; that the sale does not come within the prohibition of the constitution; that the sale of a tract of 315 acres was an irregularity, and having passed into the hands of purchasers for value and in good faith, the state cannot recover.

The case is reversed, with instructions to dismiss.

CROW, C. J., MOUNT, PARKER, ELLIS, FULLERTON, MAIN, and CHADWICK, JJ., concur.