STATE OF HAWAII *v.* KAHUA RANCH, LIMITED.

No. 4211.

July 1, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
JAMIESON, IN PLACE OF LEWIS, J., DISQUALIFIED,
AND CIRCUIT JUDGE HAWKINS, IN PLACE OF
MIZUHA, J., DISQUALIFIED.

OPINION OF THE COURT BY WIRTZ, J.

This case concerns a bill for reformation brought by the State of Hawaii, plaintiff-appellee, as successor in interest to the Territory of Hawaii, covering the right of Kahua Ranch, Limited, defendant-appellant, as lessee of the State under General Lease No. 3358, dated February 14, 1951, (entered into between the Territory, as lessor, and Kahua, as lessee) to use "the Government waters arising on the land of Kawaihae 1st."

Under this lease the government demised to Kahua certain lands[1] in the Ahupuaa of Kawaihae 1st by metes and bounds:

"TOGETHER ALSO WITH the right to utilize so much of the Government waters arising on the land of Kawaihae 1st as are in excess of that which are or may be appurtenant to the lands of others, but the same shall be used by the Lessee only for his stock, irrigation, or domestic purposes, and not for resale to any other person or persons unless said Lessee shall have received the prior written consent of the Lessor."

The bill for reformation alleges:

"That at the time of making said agreement [General Lease No. 3358] and immediately prior thereto,

---

[1] The land of Kawaihae 1st is in South Kohala on the island of Hawaii and consists of two sections, namely, (1) the Hawaiian Homes Commission land, which extends from a crest of the Kohala Mountains, formed by Puu Ahia, Puu Mala and Puu Pala, in a southwesterly direction to the ocean along Kawaihae Bay, and (2) the forest reserve area, being a portion of the Kohala Mountain Forest Reserve, adjacent to the Hawaiian Homes Commission land and extending from such crest in an easterly direction toward the Hamakua coast. The demise under General Lease No. 3358 covered the first section only, with the exception of four small kuleanas and the area covered by the Kamuela-Mahukona road, together with the above set forth right to "waters arising on the land of Kawaihae 1st," which as seen above included the second section of forest reserve area. These waters flow naturally in two almost opposite directions because of the crest of the Kohala Mountains and the controversy centers on the portion of these waters of the forest reserve area which flow naturally away from the demised premises in a northeasterly direction.

it was agreed and understood between the parties hereto that when in said agreement they made reference to 'waters arising on the lands of Kawaihae 1st' they meant only those waters on the southwest side of the Kohala Mountains which flow naturally into the premises demised to defendant, and not 'Honokane waters,' that is, waters arising on the northeast side of the Kohala Mountains (in Kawaihae 1st) and flowing into Honokane Stream."

In its answer to the bill, Kahua set forth a counterclaim alleging that the lease had been entered into pursuant to a notice of sale after a public auction, as required by statute, and that, since the terms of the lease were in accord with those of the published notice of sale, the lease was not subject to reformation. In reply to the counterclaim the State denied this allegation.

However, in its opening statement at the trial, the State admitted that General Lease No. 3358 had been made at public auction pursuant to statutory requirement of published notice. At this juncture, Kahua moved to dismiss on the basis of this admission. The trial judge reserved his ruling on the motion. The hearing concluded, and after consideration of memoranda of law, the trial judge filed his decision denying the motion and found that there was clear and convincing evidence that a mutual mistake had been made and that relief should be granted as prayed for.

In appealing from the judgment of reformation, Kahua assigns as its first specification of error that: "The Court below erred as a matter of law in permitting reformation of a lease of public lands let pursuant to statute at public auction when no question of fraud or misrepresentation was raised."

On December 14, 1950, the government, in accordance with the requirements of the Organic Act and the provi-

sions of R.L.H. 1945, § 4531 and § 4542,[2] caused notice of the auction to be published, stating that the lands would be leased:

"* * * together with the right to utilize government waters on the land of Kawaihae 1st in excess of that which may be pertinent to the lands of other owners, but is to be used by the purchaser only for his domestic, stock or irrigation purposes, and not for resale to any outside party unless and only with the written consent of the Commissioner of Public Lands * * *."

At the auction held on February 14, 1951, Kahua was the high bidder. The bidding was spirited and brisk and the two participating bidders pushed the annual rental up to $40,500 from the upset figure of $7,500. Thereafter, General Lease No. 3358 was executed by the parties, effective as of February 14, 1951.

It should be apparent that the contract between the parties was made upon the fall of the hammer at the auction on February 14, 1951. *Territory* v. *Branco,* 42 Haw. 304. Under the requirements of Section 73(d) and (i) of the Organic Act, the Hawaii statutes in force at

---

[2] Section 73(d) of the Organic Act required all leases to "be sold at public auction to the highest bidder after due notice as provided in subdivision (i) of this section and the laws of the Territory of Hawaii." Each such notice shall state all the terms and conditions of the sale.

Section 73(i) of the Organic Act required the notice to be "by publication for a period of not less than sixty days in one or more newspapers of general circulation published in the Territory: * * *."

R.L.H. 1945, § 4531 (now R.L.H. 1955, § 99-40) provided:
"Except as otherwise provided, all transfers of government lands shall be made at public auction after not less than sixty days' notice by advertisement in two newspapers published * * *.

"Notice of any auction as above required shall contain a full description of the land to be sold as to locality, area and quality * * *."

R.L.H. 1945, § 4542 (now R.L.H. 1955, § 99-51) provided:
"* * * Each * * * lease shall be sold at public auction to the highest bidder after due notice as provided in subdivision (i) of section 73 of the Organic Act and the laws of the Territory. Each such notice shall state all the terms and conditions of the sale."

the time of the auction and particularly R.L.H. 1945, § 4531 and § 4542, all of which are set forth in footnote 2, and also §§ 4511, 4514 and 4544,[3] a lease such as that involved in the present case can be validly made only after a public auction held upon due publication of notice thereof, which notice must include in detail the particulars of the lease to be offered. Here, there is no dispute that the notice of sale published December 14, 1950, and General Lease No. 3358 executed thereafter, effective as of February 14, 1951, accorded with respect to the waters which were to be granted with the lease.[4] This is not an attempt to reform the written instrument to conform to the published notice of sale. *Cf., Newark* v. *Lodato,* 139 N.J. Eq. 471, 51 A.2d 895. Nor is relief sought to correct a clerical

---

[3] "Section 4511. The commissioner of public lands * * * shall have power to lease, sell or otherwise dispose of the public lands * * * in such manner as he may deem best for the protection of agriculture, and the general welfare of the Territory * * *." (Now R.L.H. 1955, § 99-12.)

Section 4514 provides that all "* * * leases * * * of any government land * * * shall be prepared by, and issued from the office of the commissioner of public lands; * * *." (Now R.L.H. 1955, § 99-15.)

"Section 4544. Except as provided in section 4542, and subject to the approval of the board of public lands when required by section 4241, the commissioner may at his discretion make general leases of public lands for any number of years, not to exceed twenty-one, at public auction * * *." (Now R.L.H. 1955, § 99-53.)

[4] Outside of conforming the language to the situation, i.e., by substituting in the lease the words "lessee" for "purchaser" and "lessor" for "Commissioner of Public Lands," and an improvement in style, i.e., by substituting in the lease the word "appurtenant" for "pertinent," the only real change involved the insertion in the lease of the word "arising" after "government waters." While this might affect the quantity and classification of the government waters, as "waters on the land" may not necessarily be and include more than "waters arising on the land," no significance was ascribed to the *insertion* and no issue concerning this change was raised either at the trial or on argument before this court. However, the record discloses that initially the State, and most of its witnesses, felt that all of the waters flowing through the Kahua ditch were in controversy. Such, however, was not the case as the evidence clearly showed that only a portion of the waters flowing in the Kahua ditch, which traverses the forest reserve portion of Kawaihae 1st, arise "on the land of Kawaihae 1st." These are the waters which flow naturally away from the demised premises in a northeasterly direction from the crest of the Kohala Mountains. The Kahua ditch is operated by the Kohala Ditch Company, Limited, a licensee of the State.

error or inadvertence. *Cf., Fullerton* v. *City of Des Moines,* 147 Iowa 254, 126 N.W. 159, but see earlier decision in 115 N.W. 607.

With this background in mind, we proceed to a consideration of the power of a court of equity to reform a contract which, because of mutual mistake, does not reflect the true intention of the parties thereto.

As the State has pointed out, where private interests are involved, the general rule is that relief through reformation may be had when the written instrument does not, through a mutual mistake of fact, conform to the intention of the parties to the instrument. 3 Pomeroy, *Equity Jurisprudence,* 5th ed., § 870, pp. 384-386; 45 Am. Jur., *Reformation of Instruments,* § 55, p. 617; 5 Williston, *Contracts* (rev. ed.), § 1547, p. 4336; *Horner* v. *Horner,* 22 Haw. 9, 15; *Philippine Sugar Estate Dev. Co.* v. *Gov't of the Philippine Islands,* 247 U.S. 385. Had this actually been a private sale, as the State in effect is contending, this rule resolving private interests might be applicable. Such, however, is not this case.[5] The issue presented in the first specification of error under this appeal is whether the trial court "erred as a matter of law in permitting reformation of a lease of *public lands* let pursuant to statute at *public auction* when no question of fraud or misrepresentation was raised." (Emphasis supplied.)

In support of its position that the trial court did so err, Kahua points to the rule forbidding reformation of sheriff's deeds made pursuant to public auction after public notice of sale, as an analogous situation. 3 Pomeroy, *Equity Jurisprudence,* 5th ed., § 871(b); 45 Am. Jur., *Reformation of Instruments,* §§ 21 and 22; *Davenport* v. *Biddle,* 223 Ala. 28, 134 So. 642; *Cusimano* v. *Spencer,*

---

[5] The fact that Kahua made suggestions relative to improvement of the land by the lessee does not change the character of the public sale. *Fasi* v. *Land Commissioner,* 41 Haw. 461.

194 Miss. 509, 13 So. 2d 27; *Stearns* v. *McHugh,* 35 S.D. 185, 151 N.W. 888. *Cf., Dover* v. *Bickle,* 171 Ark. 683, 285 S.W. 386; *Hull* v. *Calkins,* 137 Cal. 84, 69 Pac. 838; *Fisher* v. *Villamil,* 62 Fla. 472, 56 So. 559. The rationale in support of this rule is thus given in the leading case of *Trachtenberg* v. *Glen Alden Coal Co.,* 354 Pa. 521, 530, 47 A.2d 820, 824, where the court stated:

"* * * the public is entitled to be correctly informed by advertisement of the size and nature i.e. of the exact identity, of the property to be sold at the sheriff's sale so that possible purchasers may bid with exact information as to what they are bidding on. That there should be no concealment or misrepresentation, intentional or otherwise, of a fact which if known would affect bidding at a public sale conducted by an official representative of the Commonwealth is incontestable * * *."

Or as stated by the court in *Alfalfa Lumber Co.* v. *Mudgett* (Tex. C.A.), 199 S.W. 337, 339:

"* * * If upon the advertisement and sale of entirely different property the mistake in the original mortgage would permit a reformation of the sheriff's deed, the entire purpose of the advertisement of the property by the sheriff would be defeated * * *. It cannot be known who would have bid, nor the amount of the bid, nor that appellant would have been the purchaser * * *."

The State countered by pointing to authorities supporting the contrary rule permitting reformation in such situations. 3 Pomeroy, *Equity Jurisprudence,* 5th ed., § 871(b), p. 398; Annot., *Reformation after Foreclosure,* 172 A.L.R. 655-656, 665; *Quivey* v. *Baker,* 37 Cal. 465;[6]

---

[6] While questioned in *Hull* v. *Calkins, supra,* 137 Cal. 84, 69 Pac. 838, it was not overruled. *Hanlon* v. *Western Loan & Bldg. Co.,* 46 Cal. App. 2d 580, 116 P.2d 465.

*Radnor Bldg. & Loan Ass'n* v. *Scott,* 277 Pa. 56, 120 Atl. 804;[7] *400 East 58th St. Corp.* v. *Weiner,* 38 N.Y.S. 2d 155.[8] *Perry* v. *Lucas,* 11 Haw. 350 was cited for the proposition that instruments given pursuant to a statutory power are subject to reformation in a court of equity.[9]

A sheriff's sale on mortgage foreclosure or upon execution of judgment is analogous to the sale of public lands, or interests therein, now under consideration only to the extent of requiring a sale at auction upon publication of a notice of sale. However, inasmuch as a sheriff's sale is not made to safeguard the public interest as such, as in the present situation, and involves private interests, there are situations where a court of equity might well exercise its authority to balance the equities between debtor, creditor and purchaser. This is illustrated in the cases collected in an annotation entitled *Reformation after Foreclosure,* in 172 A.L.R. 655.

Moreover, it would appear that the basis for the refusal to reform sheriff's deeds after foreclosure rests upon the proposition that the purchaser at a sheriff's sale gets only that which has been advertised and levied upon. It has been considered a jurisdictional question where relief has been denied, as the would-be purchaser cannot obtain relief in equity through reformation in order to have con-

---

[7] Not alluded to or even cited in the later *Trachtenberg* case, *supra,* 354 Pa. 521, 47 A.2d 820.

[8] Actually involved reformation of admittedly ambiguous language.

[9] Dictum as the case involved a Land Commission Award based on a private transaction between the government and the individuals involved rather than a sale of public lands at public auction. There the court was faced with a "bill to remove a cloud, to establish boundaries and for an injunction." The relief was denied and in so doing the court inadvertently included in its decision the words "a bill to reform" as synonymous with "a bill to remove a cloud." The court, nonetheless, stated: "It is evident that the bill cannot be sustained as a bill to reform the Award and Patent for, *not to mention other reasons,* there are no allegations to show how they ought to be reformed." (Emphasis supplied.) 11 Haw. 356.

veyed to him that which has never been brought into court. See *Dunnivan* v. *Hughes*, 86 Ark. 443, 111 S.W. 271, where there was a mistake in the description presented both in the advertisement and the deed the court refused reformation saying the chancery court was without authority to reform the proceedings. See also *Tatum* v. *Croom*, 60 Ark. 487, 30 S.W. 885.

While some support could be derived from the rule denying reformation of sheriff's deeds made pursuant to public auction after public notice of sale, we prefer to bottom our ruling on firmer ground, leaving open the rule finally to be adopted by Hawaii in the sheriff's sale situation until squarely presented and considered in a proper case. We need not linger, then, over these cases or the reasons for the rules discussed therein. More adequate grounds for our decision are to be found elsewhere.

The statutory provisions of Hawaii forbid any agreement between the State and a prospective bidder for a lease of State land inconsistent with the terms of the notice of sale as published. Any such agreement contrary to the terms of the published notice of sale would be illegal and unenforceable. Otherwise, the statutory requirements become meaningless. They were "enacted to prevent improvident bargains and corruption." *Fasi* v. *Land Commissioner, supra,* 41 Haw. 461, 475. Where there has been strict compliance with the statutory requirements the sale is conclusive on all parties. *Cf., Munoz* v. *Commissioner of Public Lands,* 40 Haw. 675, 689.

Under a statutory sale of a lease of public lands at public auction, bids are made in reliance on the terms and conditions specifically expressed in the published notice of sale. Reformation would create a lease different from that which was offered at public auction. To allow modification thereof to effectuate a publicly undisclosed mental reservation or intent of the government would defeat the

very purpose of the statutory requirements of public notice and sale at auction. It would destroy the element of certainty in public competitive transactions and contravene the mandatory requirements of the statutes. This was early expressed in an opinion of the Attorney General of the Territory of Hawaii:

"Our statute * * * requires that all general leases be made at public auction and it is evident that to have competition the terms and conditions must be determined prior to the auction. Genuine competition can result only when parties are bidding against each other for precisely the same thing on precisely the same footing * * *. The objects sought are to secure the benefit and advantage of fair and just competition between bidders and at the same time close as far as possible every avenue to favoritism and fraud in its various forms by subjecting the sale of the lease to public competition. If the Land Commissioner were permitted to auction a lease without making public all the terms or to materially modify the terms thereafter, the object sought to be secured by public auction would be defeated. The attempted modification of a fifteen-year lease to one with an option to terminate at the end of seven (7) years is, in my opinion, a material modification, and consequently void." Ops. Att'y Gen., pp. 329-330 (1915-1916).

This purpose and importance of the published notice in competitive public transactions is thus stated by McQuillin:

"In order to attain competitive bidding in its true sense, proposals for bids must be invited under circumstances which afford a fair and reasonable opportunity for competition. Consequently it is essential that the bidders, so far as possible, be put on terms of perfect equality, so that they may bid on substan-

tially the same proposition, and on the same terms * * *." 10 McQuillin, *Municipal Corps.*, (3d ed.) § 29.52, pp. 312-313.

Against this background of legislative intent requiring the notice of bidding to contain specifically the essentials of the contract to be entered into and the contract to be made by free and open public bidding, it shocks the conscience to even consider that a court of equity could render indirectly by reformation an agreement which, if made directly, would be illegal and unenforceable. That the State now claims to have imperfectly expressed its intent can have no relevance. *Cf., State* v. *Ort,* 66 Wash. 130, 119 Pac. 21; *accord, State* v. *Hewitt. Land Co.,* 74 Wash. 573, 134 Pac. 474.

The intervention of the public interest with that of the actual and prospective bidders brings into play the well settled principle that where the relief sought will do substantial injury to third persons, equity will refrain from acting. 2 Restatement, *Contracts,* § 504, p. 968. The detrimental effect to the public interest cannot be ignored as "it is obvious that the effect of reformation if granted must influence the action of the court of equity on the application for it. Cases reviewed, 44 A.L.R. 78; Restatement, Contracts, § 504 * * *." *Mutual Life Ins. Co.* v. *Metzger,* 167 Md. 27, 31, 172 Atl. 610, 612.

An exhaustive, as well as intensive, search has disclosed a paucity of cases bearing on this question of transfers of interests in public lands inconsistent with the terms of a published notice of sale. In their lonely vigil, they bear desolate witness to the obviousness of the answer.

In *Markey* v. *City of Bayonne,* 24 N.J. Super. 105, 115, 93 A.2d 589, 594-595, the court held invalid a conveyance of more public land than had been advertised for sale stating:

"* * * To permit a municipality to do so would be

a fraud upon the statute and in derogation of the public interest.

"The purpose of publicly advertising a contemplated sale of park lands under [the statute] is to give to the world clear and definite notice of the lands to be sold and the minimum price at which the municipality will sell. Those who read the public notice, and particularly the residents and taxpayers of the municipality, have a right to rely upon its terms * * *.

*    *    *    *    *    *    *    *

"The municipality claims that it intended all along to sell the [additional] land * * * and that the corporate purchaser intended to buy it * * *, since the [additional] area * * * is valueless by itself, being elevated land. Assuming there was such an understanding between the parties to the deed, it cannot under the circumstances control. Both the seller and the buyer were bound by the explicit metes and bounds description contained in the authorizing resolution and the public notice of sale."

In *Vaccaro* v. *Asbury Park Enterprises*, 42 N.J. Super. 288, 297, 126 A.2d 213, 218, the court denied the authority of the city council to issue a permit to the purchaser to build on a lot in contravention of a restriction imposed thereon in the grant by the city pursuant to the advertisement of sale, saying that "if a municipal governing body could waive a restriction which it imposed on land as a condition of its sale after its sale and conveyance, the door would be wide open for fraud and favoritism."

This is an unusual situation in that the bill for reformation is brought by the seller rather than by the buyer and seeks to cut down rather than enlarge upon the interest covered by the written instrument. However, such situation should not change the principles applicable to

reformation. See *Konig* v. *Mayor, etc. of Baltimore,* 126 Md. 606, 95 Atl. 478.

The public interest here present, in addition to that of bidders at the sale as well as that of prospective bidders, precludes reformation of a written instrument which conforms in its terms to the published notice of the sale of a lease of public lands at public auction. Accordingly, the trial judge below erred in denying the motion to dismiss.

In view of this conclusion, it is unnecessary to consider the remaining specifications of error relating to the admissibility of evidence and the findings of the trial judge. An examination of the record, however, prompts the observation that if any understanding between the State and Kahua relied upon as a basis for reformation had been established by the clear and convincing proof required for that purpose,[10] such understanding appeared to cover a period so remote in point of time[11] as to have little, if any, probative value. The testimony of the competing fellow bidder at the auction concerning her understanding as to available government waters would seem to be incompetent to establish the state of mind of Kahua in making its bid. See VII Wigmore, *Evidence,* § 1971, p. 112, n. 3. *Cf., Durrence* v. *Northern Nat'l Bank,* 117 Ga. 385, 43 S.E.

---

[10] *Leong Kau* v. *Monting,* 7 Haw. 415.

[11] Subsequent to the expiration on June 30, 1949, of the previous government lease covering the demised premises, which contained no provision relative to the use of water, discussions were had between all interested parties, including representatives of Kahua, at public meetings of the Land Board, commencing at the August 1949 meeting, as to the feasibility of leasing the land of Kawaihae 1st in two parts rather than as a whole in conjunction with the problem of water use and culminating with the meeting of December 9, 1949, at which time it was decided by the Land Board to lease the land in its entirety. There was also correspondence on the subject from representatives of Kahua to the Land Commissioner during this period. However, the record is silent as to what, if anything, took place between the meeting of December 9, 1949 and the publication of the auction notice on December 14, 1950 and the auction held on February 14, 1951.

726; *State* v. *Kilburn,* 16 Utah 187, 52 Pac. 277; *Manufacturers & Traders' Bank* v. *Koch,* 105 N.Y. 630, 12 N.E. 9; *State* v. *Pierce,* 85 Minn. 101, 88 N.W. 417. However, as seen, it is not required that the findings of the trial judge be considered and reviewed.

Reversed and remanded for entry of judgment for defendant, dismissing the bill for reformation.

*Frank D. Padgett* (*Robertson, Castle & Anthony* with him on the briefs) for defendant-appellant.

*Bert Kobayashi,* Attorney General, and *Andrew S. O. Lee,* Deputy Attorney General (*Shiro Kashiwa,* Attorney General, *Andrew S. O. Lee,* Deputy Attorney General, and *Morio Omori,* Special Deputy Attorney General, on the brief), for plaintiff-appellee.